

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

---------------------------------------------------------- X
:
UNITED STATES OF AMERICA, *ex rel.,*    :
STOP ILLINOIS MARKETING FRAUD,    :   13cv9059
LLC    :    Judge Castillo
   :    Mag. Judge Valdez
   :   Ca
          Plaintiffs,    :
   :
      V.    :   **Filed Under Seal**
   :   **Pursuant to**
ADDUS HOMECARE CORPORATION,    :   **31 U.S.C. § 3730**
AND CIGNA CORPORATION    :
          Defendant.    :
   X
----------------------------------------------------

**FILED**

DEC 1 9 2013

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## COMPLAINT OF THE UNITED STATES

The United States of America by and through its *qui tam* Relator, Stop Illinois Marketing Fraud, LLC ("Relator") brings this action under the Federal False Claims Act, 31 U.S.C. § 3729-3733, *et seq.* (the "False Claims Act") against Addus HomeCare Corporation ("Addus") and Cigna Corporation to recover all damages, penalties, and other remedies provided by the False Claims Act on behalf of the United States and the Relator, and for their complaint allege:

1.      This is an action to recover treble damages and civil penalties on behalf of the United States of America arising from false and fraudulent records, statements and claims made, used and caused to be made, used, and presented by Defendants and/or their agents, employees, predecessors, affiliates and co-conspirators, in violation of the federal False Claims Act.

2.      As set forth in more detail, herein, Defendants implemented a multi-faceted scheme to defraud the United States. Specifically, Addus improperly and illegally marketed, offered, and provided home health services to nearly all of its customer-beneficiaries to whom it provided

1

services regardless of whether they were qualified for home health services. To achieve its end, Addus secured the cooperation of amenable physicians, physicians who negligently and/or recklessly assisted Addus in its scheme, and employed the services of "captive" physicians (employed by the predecessor-in-interest to defendant Cigna) who would certify patients as eligible for services reimbursable under Medicare and Medicaid even though those patients were *not* eligible for services. Through its scheme, from 2008 through 2013, defendant Addus illegally billed the government for, and collected, and profited to the tune of tens of millions of dollars.

**PARTIES**

3.      Relator in this matter is Stop Illinois Marketing Fraud, LLC, a Delaware limited liability company formed for the sole purpose of bringing this action under the False Claims Act. Relator's address is: 800 Delaware Ave. Wilmington, DE 19801. Relator's allegations are based, in part, on the statements of CW1, who was employed by Addus from November 2010 through April 2012 as an Account Executive, a title given by Addus to sales personnel who market home health in specific regions. CW1 is an employee of Relator.

4.      Relator is the original source of the information upon which this complaint is based, as that phrase is used in the False Claims Act and other laws at issue herein.

5.      Relator brings this action based the direct knowledge of CW1 and, where indicated, on information and belief. None of the actionable allegations set forth in this Complaint are based on a public disclosure as set forth in 31 U.S.C. §3730(e)(4).

6.      Plaintiff United States of America, acting through the Department of Health and Human Services ("HHS"), and its Centers for Medicare and Medicaid Services ("CMS"),

2

administers the Health Insurance Program for the Aged and Disabled established by Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq*. ("Medicare").

7.      Defendant Addus is a Delaware corporation with its headquarters located at 2401 South Plum Grove Road, Palatine, Illinois.  Addus provides home and community based services in nineteen states, including Alabama, Arkansas, California, Delaware, Georgia, Idaho, Illinois, Indiana, Mississippi, Missouri, Montana, Nevada, New Jersey, New Mexico, North Carolina, Oregon, Pennsylvania, South Carolina, and Washington. Through February 13, 2012 Addus' services could be broken down into four major categories: (1) Home & Community Based Services; (2) Home Healthcare; (3) Adult Day Services; and (4) Private Duty Care. Addus HomeCare Corporation was incorporated in Delaware in 2006 under the name Addus Holding Corporation to acquire and become the sole owner of Addus Healthcare.   Addus Healthcare is the operating subsidiary of Addus HomeCare.  Addus Healthcare was started in 1979 and since that date, Addus has been a comprehensive provider of a large range of social and medical services in the home.

8.      Defendant Cigna Corporation ("Cigna") is the owner of Home Physicians Management, LLC, D/B/A Alegis Care ("HPG") a is Delaware corporation with its headquarters located at 900 Cottage Grove Road, Bloomfield, Connecticut.  HPG is a health care management company, founded in 1995, that provides support services to and through Home Physicians which is, with itself and others, responsible for many of the acts complained of herein.  HPG has approximately 80 providers, and provides home physician services to the elderly and disabled in Illinois, Indiana, Delaware, Utah, Maryland, Michigan, Wisconsin, and Washington; and Washington, D.C. It offers direct patient care health services, such as primary care services for medical conditions, medical testing, as well as hospital-to-home transitional care and post-

hospital discharge support and other Medicare-reimbursable services. In September, 2013, Cigna acquired HPG and, upon information and belief, is its successor-in-interest. Cigna is thus properly a defendant.

## JURISDICTION AND VENUE

9. Jurisdiction in this Court is proper pursuant to 31 U.S.C. §§ 3732(a) and 3730(b). This Court also has jurisdiction pursuant to 28 U.S.C. § 1331.

10. The Court may exercise personal jurisdiction over the Defendants, and venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because the acts proscribed by 31 U.S.C. §§ 3729 *et seq*., and complained of herein took place in part in this District and the Defendants transacted business in this District as described herein.

11. Pursuant to 31 U.S.C. § 3730(b)(2), Relator prepared and served the Complaint on the Attorney General of the United States, and the United States Attorney for the Northern District of Illinois, a statement of all material evidence and information currently in its possession and of which it is the original source. These disclosure statements are supported by material evidence known to the Relator at the time of filing establishing the existence of Defendants' false claims. Because the statements include attorney-client communications and work product of Relator's attorneys, and were submitted to those Federal officials in their capacity as potential co-counsel in the litigation, Relator understands these disclosures to be confidential and exempt from disclosure under the Freedom of Information Act. 5 U.S.C. § 552; 31 U.S.C. § 3729(c).

## LEGAL BACKGROUND

*The False Claims Act*

12. The False Claims Act provides, in pertinent part:

4

(a) Liability for certain acts. -

    (1) In general. —Subject to paragraph (2), any person who —
        (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

        (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

        (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

        (D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;

        (E) is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

        (F) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or

        (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

(b) Definitions. — For purposes of this section (1) the

    terms "knowing" and "knowingly" –

        (A) mean that a person, with respect to information

(i) has actual knowledge of the information;

(ii) acts in deliberate ignorance of the truth or falsity of the information; or

(iii) acts in reckless disregard of the truth or falsity of the information; and

(B) require no proof of specific intent to defraud;

(2) the term "claim" —

(A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that –

(i) is presented to an officer, employee, or agent of the United States; or

(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government –

(I) provides or has provided any portion of the money or property requested or demanded; or

(II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and

(B) does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property;

(3) the term "obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment; and

(4) the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property,

31 C.S.C. § 3729(a), (b).

13.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 C.S.C. § 2461 (notes), and 28 C.F.R. § 85.1, False Claims Act civil penalties were increased from $5,000 to $11,000 for violations occurring on or after September 29, 1999.

**ADDUS' SCHEME**

*Overview of Addus' Home & Community Based Services*

14.     Addus' Home & Community Based Services program provides personal care and home support services to patients who are unable to independently perform some or all of their activities of daily living.  Personal care services can include bathing, grooming, mouth care, skin care, assistance with feeding and dressing and medication reminders.   Home support services include meal planning and preparation, housekeeping and transportation services. These services are called "Unskilled Services."

15.     Approximately 95% of the Unskilled Services provided by Addus is reimbursed by the various States' Medicaid waiver programs.   Specifically, the Medicaid Home and Community-Based Services (HCBS) waiver program which is authorized in §1915(c) of the Social Security Act. The program permits a State to furnish an array of home and community-based services that assist Medicaid beneficiaries to live in the community and avoid institutionalization. Each State has broad discretion to design its waiver program to address the needs of the waiver's target population. Waiver services complement and/or supplement the services that are available to participants through the Medicaid State plan and other federal, state and local public programs as well as the supports that families and communities provide.

16.     Generally, under the waiver program, States designate a Social Services division such as the Division of Aging to coordinate the provision of these services to qualified

individuals. Each State establishes a process by which persons of need are identified, assessed and ultimately qualified for the services. A qualified beneficiary's services are approved in hourly units, and within certain days within certain windows of time. For example, a beneficiary may be approved by the State's agency for 10 hours per week and mandate that the hours are to be performed Monday through Friday 2 hours per day between 8 a.m. and 10 a.m.

17.     Addus hires aides to act as home care aides who will travel to the beneficiary's home to provide the services needed. Addus has over 20,000 customer-beneficiaries receiving these services. This generates material revenue for Addus. From 2009-2011, Addus generated approximately $210 million, $220.8 million, $221.5 million, respectively, from Unskilled Services.

18.     While Addus operates in 19 states it receives the lion's share of its Unskilled Services' revenue from the Illinois Department of Aging, which has historically counted for between 31-43% of Addus' net services revenue.

*Overview of Addus' Home Healthcare Services*

19.     In addition to Unskilled Services, until March 2013, Addus Home HealthCare provided in home Medicare reimbursed home health services.

20.     Medicare Parts A and B cover home health services furnished to Medicare beneficiaries. Social Security Act, §§ 1814(a)(2)(C) and 1835(a)(2)(A), 42 U.S.C. §§ 1395f(a)(2)(C) and 1395n(a)(2)(A).

21.     Part A covers home health services beginning within 14 days of a discharge from a hospital or skilled nursing facility. Social Security Act, § 1861(tt), 42 U.S.C. § 1395x(tt), and the Centers for Medicare & Medicaid Services (CMS), *Medicare Benefit Policy Manual*, Pub. 100-02, ch.7, § 60.1.

22. Part B covers home health services not related to an inpatient stay. Social Security Act, § 1832(a), 42 U.S.C. § 1395f(a), and CMS, *Medicare Benefit Policy Manual*, Pub. 100-02, ch. 7, § 60.3.

23. Home health services include part-time or intermittent skilled nursing services, physical therapy, occupational therapy, speech-language pathology services, part-time or intermittent home health aide services, medical social services, and medical supplies and durable medical equipment.

24. These services are medical in nature and include physical, occupational and speech therapy, as well as skilled nursing. These services are referred to as "Skilled Services."

25. Addus receives material revenues from the provision of Skilled Services. According to the Company's Annual Reports, from 2009-2011, Addus generated approximately $30.16 million, $32.63 million, and $33.44 million in Medicare net revenue, respectively, from Skilled Services.

26. During that time period Addus made a marked and substantial effort to grow its Home Healthcare Services group. Specifically, Addus recognized that for its Unskilled Services market, its average length of service was 20 months, its average reimbursement per client was $16,199.00, its average gross profit per client episode was $4,244.00, and *its gross margin was 26.2%*. Conversely, in the Skilled Services market its average length of service was 2.7 months, its average reimbursement per client was $3,199.00, its gross profit per client episode was $1,468.00 and *its gross margin of 45.9%* (almost double the amount it was receiving through Unskilled Services).

27. Gross margin is among the most important indicators of a company's performance (and thus value); it represents the amount of profit that the company makes for providing a given

unit of its product (in this case, customer-beneficiary services).[1] Thus, if Addus could increase the number of customer-beneficiaries it serviced through the Home Healthcare Services group, it would make that group all the more valuable and generate a greater return on a per-dollar-expended basis for the Company.

28.     Accordingly, starting in 2007, Addus began focusing on converting existing beneficiary-customers it serviced through its Unskilled Services group to beneficiary-customers it serviced through its Skilled Services group. These efforts, if successful, would result in a substantial and material increase in value for Addus' Home Healthcare Services group. In order to achieve this end, Addus focused in on what are called "dual eligibles." These are patients who are 65 years or older with low income amounts and therefore typically qualified for both Medicare and Medicaid.

29.     Addus' efforts were ultimately successful; from 2007 to 2012, it substantially grew its Home Healthcare Services group. After successfully growing that group, the company elected to profit-take that growth by selling off the division.

30.     On February 7, 2013, Addus entered into an asset purchase agreement with LHC Group, Inc., wherein LHC Group agreed to purchase substantially all of Addus' assets in its Home Healthcare Services group in Arkansas, Nevada and South Carolina and 90% of such assets in California and Illinois. That transaction was completed on March 1, 2013, and resulted

---

[1] For example, if a company provides a service for which it charges $2.00, and providing that service costs the company $1.00, its margin on that service is $1.00. Such a service would be far more valuable to the company than another service for which it charges $5.00, but which costs it $4.00 to provide, resulting in margin of $1.00. Indeed, the gross margin percentage is 50% in the first example, and just 20% in the second example. So, while the profit from each of the services is equal, $1.00, the first service is far more valuable because generating that profit it costs the company so much less This is akin to the different between Addus' Skilled and Unskilled Services; while Addus brought in far more *revenue* per customer-beneficiary to whom it provided Unskilled Services, it made far more money on each unit of Skilled Services it provided for each dollar it had to spend to provide those services.

in the virtual cessation of Addus' Home Healthcare Services operations. Addus now functionally focuses solely on the provision of Unskilled Services through its Home & Community Based Services group.

31. Upon information and belief, the sale of Addus Home Healthcare Services group was one of the motives underlying the Company's violations of the False Claims Act. That is, the Company and its senior management were well-aware that if they could increase the value of the Home Healthcare Services group by converting patients from Unskilled Services to Skilled Services, Addus could not only profit during the time it retained the Home Healthcare Services group, but that it could then sell off that group for a substantial premium compared to that which it would achieve in the absence of its scheme.

*Addus' Scheme to Illegally Convert Customer-Beneficiaries from*
*Unskilled to Skilled Services*

32. Medicare will only lawfully pay for home health services if the patient is:

> (a) confined to the home (homebound);
> (b) under the care of a physician; and
> (c) in need of skilled nursing services on an intermittent basis or physical or speech therapy, or is in need of continued occupational therapy after eligibility for home health services was established by a prior need for one of the other qualifying services. 42 U.S.C §1395(f)(a)(2)(C);42 C.F.R. § 409.42

33. The requirement that a patient be "homebound" before being eligible for home health services is critical. In order to be considered homebound, a patient must have a health condition that restricts his or her ability to leave the home except with the aid of supporting devices, or have a condition that makes leaving the home medically contraindicated (if, for example, leaving the home requires a considerable and taxing effort) 42 U.S.C. § 1395f(c); Medicare Intermediary Manual § 3117.1. Upon information and belief, and as discussed in further detail, below, Addus solicited, enrolled, and provided home care services to customer-

11

beneficiaries who were not homebound; they drove, were independent, and were otherwise free and able to leave their homes and take care of themselves. Importantly, Addus submitted claims to and was paid by Medicare for such beneficiaries, even though they were not homebound and thus not eligible for Medicare reimbursed home health care.

34.     Medicare also requires that the patient receiving services require intermittent skilled nursing services, physical therapy, or speech-language pathology services. Continuing occupational therapy services can also provide a basis for eligibility if the patient's initial eligibility was established by a prior need for one of the other qualifying services. In other words, at least one type of skilled service must be medically necessary in order for the patient to be eligible for home health care services. In order to qualify as skilled services, the services must be of such a level of sophistication and complexity, or the condition of the patient must be such that the services can only be safely and effectively performed by, or under the supervision of, a registered nurse or a qualified physical or occupational therapist or speech-language pathologist. 42 C.F.R.§ 409.44; Medicare Intermediary Manual § 3118. Upon information and belief, and as discussed in further detail, below, Addus solicited, enrolled, and provided home care services to customer-beneficiaries who did not actually require skilled care. Importantly, Addus also submitted claims to and was paid by Medicare for beneficiaries who did not actually require skilled care and thus not eligible for Medicare reimbursed home health care.

35.     Addus aggressively marketed, offered, and provided home health services to nearly *all* of its customer-beneficiaries to whom it provided Unskilled Services *regardless of whether they were qualified*. Addus even named and trademarked its scheme, calling it "The Addus Dual Advantage."

36. Under this scheme, Addus' Unskilled Services aides were heavily trained by the Company to do whatever it took to convert a customer-beneficiary receiving Unskilled Services into one receiving Skilled Services. Through its scheme to convert its customer-beneficiaries from receiving Unskilled to Skilled Services, from 2008 through March of 2013, Addus more than doubled its Home Healthcare Services group revenue. An overwhelming percentage of the conversions through this scheme took place in the State of Illinois.

37. Addus employed a number of means to achieve its end.

38. First, Addus employed a senior housing marketing scheme. By way of background, many of Addus' Unskilled Services customer-beneficiaries were concentrated and resided in senior living facilities or developments. There, Addus had access not only to those individuals that it directly serviced, but it had access to an untapped market of individuals it did not currently service.

39. Upon information and belief, Addus managment created an "action plan" through which its senior managers actively sought out and marketed property owners (both corporate and individuals) on the concept of allowing Addus to establish wellness centers in these facilities.

40. As a selling point, Addus promised to staff the wellness centers with an on-site care coordinator[2] who could purportedly promote health and wellness of the residents and also give

---

[2] The structure through which the Company provided healthcare services was straightforward. Care coordinators were formally tasked with liaising between the Company's home care services branch and the skilled services branch. They were typically assigned to a facility or group of facilities and, in actuality, were tasked with convincing residents to accept Skilled Services (regardless of whether they were actually eligible to receive such services) for which the Company would then bill Medicare. Account executives, the next rung up on the ladder, typically serviced a sales territory covering several care coordinators and were responsible for doing whatever it took to maximize the number of residents receiving skilled services from the Company (again, without regard to whether they were actually eligible to receive such services). Account Executives, in turn, reported to State, Agency, and Regional Directors within the Company's Home Healthcare segment.

advice and guidance to the residents in the event of a medical or behavioral change that might require medical intervention.

41.     To establish a wellness center, Addus would sign a lease and pay rent for an apartment or some other space and convert it to operate as a wellness center. The wellness centers, however, were anything but; they existed not so the Company could promote wellness or well-being but instead existed as a vehicle through which Addus would unlawfully mine and convert seniors for its own profits and purposes. This scheme is discussed in detail, below.

42.     Additionally, Addus engaged in "start of care" marketing or soliciting – and was also unlawfully targeting seniors residing in senior housing facilities for Medicare reimbursed home health care.

43.     By way of example, Addus routinely scheduled monthly "health chats" and/or health "screenings." These and other events were used as a pretext as a means for Addus to prey upon and gain access to Medicare card holding seniors. During these events, seniors were asked to provide their own confidential health information. Armed with the medical information, Addus then could "up sell" the individual on a "free nursing assessment." The "free nursing assessment" would serve two purposes. First, it would allow Addus to bill Medicare or Medicaid for the session itself. Second, it would allow Addus to further access the customer's health information and open to door to the provision of more services to the customer regardless of need.

44.     Additionally, twice a week, screenings were done by Addus staff (called "care coordinators") on senior facility residents in the form of glucose checks and blood pressure checks. The health checks were typically performed by the care coordinator on site at the building. On average, approximately, 20-25 would stop by for any given screening.

14

45.     Once again, it was Addus' policy to collect the participating senior's demographic and health information. Seniors were probed and any and all potential issues (no matter how small) was flagged in an effort to justify the Company's provision of services for which it would then bill Medicare or Medicaid.

46.     Addus management instructed care coordinators to aggressively give a "sales pitch" to seniors with the sole goal and intent of convincing them to consent to the provision of Skilled Services even though the seniors were not otherwise qualified for services. . According to the Relator, approximately, 20% of the patients who stopped by for a "health chat" or screening were ultimately converted into customer-beneficiary who received Skilled Services.[3]

47.     Initially, Addus care coordinators were geared towards providing clinical services to residents. Once Addus recognized the fact that they could be used to market services and conversions from Unskilled to Skilled Services customer-beneficiaries, however, Addus immediately shifted their responsibilities from providing care and instead trained and instructed them to market and sell to potential customer-beneficiaries and to upsell and convert current customer-beneficiaries. Addus provided substantial incentives for care coordinators to "get with the program" – for each new "start of care" or conversion, they received a substantial cash bonus from Addus.

48.     In addition to the bonus that the care coordinator would receive, Addus also gave a bonus to the account executive who was charged with responsibility for these senior facilities. By tying the financial interests of the account executives to the success of care coordinators in generating "starts of care" or conversions, the Company ensured that account executives would

---

[3] As discussed below, however, the overwhelming majority of the services provided to Addus' Skilled Services customer-beneficiaries were fraudulently billed by the Company, as the customer-beneficiaries neither needed nor were properly qualified for the services provided.

be strongly incentivized to make sure that their subordinates were well-trained in the Company's goals and marketing and selling the Company at all costs.

49.     Indeed, Addus aggressively tracked the success of each care coordinator and account executive not only in generating "starts of care" but also in converting customer-beneficiaries from Unskilled Services to Skilled Services.

50.     That the foregoing was all part of Addus' scheme is confirmed by the fact that care coordinators were expressly trained, and in fact did, only pitch and convert those individuals who were covered by Medicare.  Said differently, Addus specifically ignored anyone who did not have a Medicare card.   That is, Addus was not interested in pitching or providing services to such individuals because even if the Company provided services to them, the Company would not be able to bill Medicare.  It would, instead, be forced to bill private insurance (assuming those without a Medicare card had private insurance), but to do so would have subjected the Company to a greater degree of scrutiny than that to which it was subject when it billed Medicare.  In simplest terms, Addus was not interested in providing healthcare to those who needed it – it was interested only in using those who could help it further its scheme of bilking Medicare.

51.     Addus' unlawful intent is further evidenced by its own managerial interventions taken when statistics revealed it had not successfully converted (or started care for) a sufficient number of Medicare eligible residents to home health care services.  When the numbers were low, Addus' Management would send a higher level staff member to run the weekly screenings or be present as a second set of eyes to ensure the appropriate probing of residents took place and their conditions were flagged for a Medicare starts of care.  This is particularly important because – if Addus was operating legitimately and honestly converting only those truly eligible

for services – it would have had no need to create a metric that measured whether the Company was converting enough individuals to home health care services. Instead, the question of conversions (or new starts of care) would have been driven by actual resident needs and not whether the Company was meeting its own targets and projections – the exact opposite of the tail-wagging-the-dog scenario that Addus artificially created for its own fraudulent financial gain.

52.     Upon information and belief, during weekly sales meetings as the numbers were being reviewed, the sales leaders strategized about the Director of Physical Therapy conducting the next upcoming screening. He did in fact go on site to conduct blood pressure checks. Another example was the local Branch Nursing Supervisor whose role was to manage the field RNs was asked to conduct the screenings for this same purpose.

53.     Addus also went to great lengths to make sure that it marketed early and marketed often. That is, Addus made sure that it was kept apprised of any potential new residents who might be moving in to a given senior facility. Once Addus learned that there was a potential new resident, it would make sure to send a care coordinator or account executive along on any tour of the facility to make sure that they had a chance to begin to bring the potential resident into Addus' fold. To that end they scheduled special meetings with any and all Medicare card holding potential residents who were interested in touring a senior facility, and made sure that they received Addus promotional literature during their tour. Indeed, in many if not all cases, as part of the building tour, the resident and/or family would sit down with the Addus representative who would give the sales pitch and even sought to conduct an assessment right then and there.

54.     The solicitation during such tours were simple and targeted. Care coordinators and account executives made sure that potential residents were told that "Addus has a wellness center

17

on site," and "we'd like to set you up for success in your new housing;" "we want to make sure that your transition to your new home goes smoothly;" we "want to make your stay at the residence successful." As above, Addus made absolutely certain to make sure that it solicited every single new potential resident that was Medicare eligible.[4]

55.     To that end, every new resident moving into a senior building was offered a "free" nursing assessment and informed that it was "covered by Medicare." During the solicitation, these residents were specifically told they would likely qualify for home health care and were pressured to allow Addus to send a referral request to their family physician.  The referral request was sent so that Addus could obtain a start of care order or a Form 485 that would allow Addus to begin providing care to the now customer-beneficiary.  Addus offered assessments to any and all new residents regardless of whether the resident was "homebound."  Indeed, Addus offered home health services to all able-bodied and independent seniors at facilities it serviced. This further reveals Addus' scheme: if it was not, in fact, bilking Medicare by providing home health services to those who were not homebound and who did not actually need such services, *it would have had no reason to offer services to otherwise independent, mobile, and healthy individuals because they could never legitimately qualify to receive services reimbursable through Medicare.*

56.     Once an otherwise healthy and ineligible client agreed to accept this free nursing assessment offer, upon information and belief, an Addus care coordinator or account executive would liberally seek to elicit any and all patient symptoms, medical conditions and/or complaints

---

[4] Obviously, this meant that good relations with facility property managers and sales personnel were critical to the accomplishment of Addus' scheme.  To that end, Addus made sure to cultivate good relationships with them, and Addus' care coordinators and account executives would regularly meet with the building property managers to go over any potential residents to whom Addus could potentially provide Skilled Services.

(no matter how big or small) in an effort to create a pretense to refer the individual to skilled nursing care  Following this, Addus care coordinators or sales representatives would complete a referral form (called an "Easy Referral Form") and fill in an exaggerated or even fabricated diagnosis (entitling the customer-beneficiary to services) on the form that was then sent for the doctor to sign-off on *even though the care coordinator or sales representative was not a trained physician and not allowed to diagnose patients* but were instead incentivized sales personnel! Not surprisingly, sometimes doctors would refuse to sign-off on the Form 485 that would start patient care because they knew that the patient had not actually been diagnosed with anything – a patient would need to meet face-to-face for an actual medical exam by a doctor before a real diagnosis could be made.

57.     Obviously, to be deeply immersed enough in the foregoing to accomplish the ends of its scheme required Addus to maintain good relations with facility property managers and sales personnel.  As such, Addus made sure to cultivate good relationships with them, and Addus' care coordinators and account executives would regularly meet with the building property managers to go over any potential residents to whom Addus could potentially provide Skilled Services. Upon information and belief, Addus management encourage spending on gifts and meals to "key personnel" in the buildings in order to keep the relationship strong and encourage a referral stream.

58.     Indeed, these relationships were so close that if a resident was hospitalized, property managers would immediately inform Addus care coordinators so that the patient could be solicited for home health services.  Once notified, Addus would immediately either contact the resident's family or go to see the resident in the hospital to so they could solicit him or her for Skilled Services to be provided immediately on the resident's discharge from the hospital.

Addus representatives aggressively pursued patient while in the hospital, and further strongly pressured patients to accept Skilled Services from Addus. Management instructed Addus account executives and care coordinators to aggressively pitch the fact that they were already servicing other residents in the patient's building and that it would cost the patient nothing. Addus' sales pitch was almost always successful and resulted in a patient referral form being prepared by Addus and presented to the hospital's discharge planner so that it could be signed by the discharging doctor as a matter of course. It was in this way that Addus assured control of patients from the senior community centers where Addus. Almost all patients who were marketed in this fashion were directly discharged into Addus' Home Health Care program and were provided Skilled Services – regardless of whether they were actually qualified under Medicare to receive such services.

*Complicit Physician Approval*

59.     As noted, above to be eligible for home health care services, a physician also must certify the patient's need for home health services. 42 U.S.C. § 1395f(a)(2)(C); 42 C.F.R. § 424.22. Specifically, in order to be covered by Medicare:

> "the services must be included in a plan of care established by a physician and reviewed and signed by that physician at least once every 62 days." 42 C.F.R. §§ 409.42, 409 .43 (1995).The plan of care is valid as of the date that it is signed, except that services provided from the beginning of a certification period and before the physician signs the plan of care are considered to be provided under the subsequently signed plan of care where the services were provided pursuant to an adequately-documented oral order, and the services are included in the subsequently signed plan of care." Medicare Intermediary Manual § 3117.2(E)

60.     Thus, not only must a physician agree, but there also must be appropriate documentation in the chart for services to be billed.

61.     Addus purported to satisfy this requirement through the Easy Referral Form referenced above. Once an Addus sales representative or the care coordinator had completed and

filled in a diagnosis that would allow Addus to provide and bill for home healthcare services, the Addus sales representative would either fax or hand deliver the Easy Referral Form to the potential customer-beneficiary's doctor and solicit his or her signature.

62.     Sometimes, doctors would sign the form without seeing the patient.  Other times, doctors would refuse to sign the form and patients were instructed to go to their family office for a full assessment and face to face.  Even then, many physicians would simply refuse to sign off on the Easy Referral Form because the inflated diagnosis by Addus employees was incorrect or unwarranted.  On such occasions, Addus would employ its own "pet" physicians at HPG to sign off on the Easy Referral Forms its employees had fabricated.   The particulars of Addus' process are discussed below.

63.     Regardless of which outcome eventuated, Addus' process of obtaining the necessary sign-off from a doctor was coordinated from the Home HealthCare group by either the care coordinator or the account executive (after all, both would be paid a bonus by Addus once the Company began providing services (*see infra* at __)).

64.     Some patient's physicians would simply assume Addus' request for a home health skilled nursing assessment was legitimate and sign and fax back the Addus Easy Referral Form.

65.     On other occasions, Addus' nurses would call and obtain a verbal order from the doctor to an Addus nurse.

66.     However, many others physician's office were too busy or inefficient to process the Addus' home health referral request.  For those, Addus had procedures in place to continuously follow up with the patient's physician and secure either a verbal order or a signed order for home care.   When pestered enough, many physicians would simply agree as it was easier than

21

continuing to deal with Addus' repeated and high-pressure solicitations of themselves and their staff.

67.    Once an order had been signed or dictated by a physician, Addus would then fraudulently over assess the patient's need for home health services.  That Addus' assessments were false and unwarranted is evidenced by the near universal admission rate of customer-beneficiaries who commenced care with Addus by receiving Unskilled Services and then transitioned at the Company's directive to receiving Skilled Services.    Relator is aware of very few, if any, clients who were assessed by Addus' nurses who were found to be not qualified for care.

68.    Finally, and most importantly, there were patients for whom their regular physicians would simply not sign-off on Addus' diagnosis, or who had no genuine reason to believe that the patient's medical condition rendered him/her "homebound" and eligible for home health care.[5]

69.    In those instances, Addus employed the sign-off of physicians employed by HPG.

70.    Specifically, once Addus employees had determined that they would be unable to secure an order from a given patient's physician, they would tell the patient that they would have one of their "partner" physicians come to their home – at no cost to the patient – and sign off.  In Illinois, Addus' "partner" was HPG.

71.    HPG had strong incentives to cater to the desires of Addus, and to certify patients referred to it by Addus regardless of whether they actually met the certification criteria of Medicare.  According to CW1, and despite the fact that the patient's own primary care physician refused to certify the patient as eligible for home health services under Medicare, HPG *assessed*

---

[5] These physicians were an impediment to Addus' ceaseless effort to convert unskilled clients to skilled patients.   Relator estimates that approximately 25% of all eventual patients had physicians who fell into this category.

22

*and universally qualified all patients that it evaluated regardless of whether those patients were*
*actually qualified under Medicare for care or not.*  Indeed, HPG physicians regularly signed (or
orally directed) home care orders and other forms without ever seeing patients that they were
certifying as eligible for care under Medicare.  According to Relator, HPG's willingness to
participate in the fraud is due to several factors.

72.     First, upon information and belief, Craig Reiff, HPG's then Chief Executive Officer,
had close personal and business ties to senior management at Addus, including James
Szymanski, Addus Home Healthcare's Regional Sales Director and Cindi Stark, Addus' Vice
President of Clinical Services.

73.     Second, based on emails provided by CW1, Addus formed the core of HPG's
business, and HPG's senior management was well-aware of it.  For example, in an email dated
March 2, 2011 from Mr. Reiff to his senior employees (an email on which, notably, Mr.
Szymanski and Ms. Start were later copied), Mr. Reiff stressed the importance of Addus to HPG,
described it as Illinois' "largest" home health care company, one of HPG's "top ten" referral
sources, and a "Priority Account" for HPG.  In short, Addus was a core customer of HPG, and it
was essential for HPG to do whatever it needed to do to keep Addus happy, or Addus would
simply take its business elsewhere.

74.     Also in that email, Mr. Reiff informed his subordinates that he had worked closely
with Mr. Reiff and Ms. Stark to create business plan for HPG that would allow it to serve Addus'
desire to accelerate starts of case, grow its senior living, assisted living, and skilled nursing
discharges (from hospitals), and to provide verbal orders (rather than written authorization which
would take longer) to Addus so that it could begin billing Medicare for skilled services
immediately rather than waiting on paperwork.  In fact, according to Mr. Reiff's email, it was of

23

the utmost importance to HPG that it hit its "key metrics -- 72 hour turn-around on new patients,

notification on home health authorizations within 24-48 hours, and 6-8 day turn-around on 485's

and paperwork" for Addus.  Indeed, Addus' business was so critically important to HPG that Mr.

Reiff – the CEO of HPG – attended Addus' regional staff meetings.

75.     Given the strong personal relationship between Mr. Reiff and senior managers at

Addus, along with the strong financial incentives that required HPG to please Addus, it is no

surprise that HPG was willing to do whatever it took – including being complicit in and actually

furthering Addus' fraud – to make sure that HPG retained Addus' business.

76.     Knowing that it had found a partner for its fraud, Addus made sure to exploit it.

According to CW1, once a patient's physician had refused (or simply failed) to certify the patient

as Addus desired, Addus personnel were *required* to then use HPG to certify the patient.  In fact,

Relator was once criticized by her superiors when she tried to get another physician to perform

an in home assessment of a potential customer-beneficiary for whom Addus had been unable to

secure an order from his/her primary care physician.  Addus senior management expressly

informed Relator that she was only to utilize HPG in such cases, and that Addus would not

tolerate any "competition."

77.     Indeed, the relationship between Addus and HPG was so symbiotic that HPG created

and distributed pre-printed "referral" forms to Addus employees that already had HPG filled in

as the medical group that would be providing a physician for an in home assessment.

78.     Given as much, it is no surprise that HPG was Addus' partner in fraud, and

universally certified each and every patient Addus referred to it.

**COUNT I – FALSE CLAIMS ACT**

24

79.     Relator repeats each allegation in each of the proceeding paragraphs of this Complaint with the same force and effect as if set forth herein.

80.     At the behest of Addus, and in conjunction with it, HPG universally assessed and qualified all patients referred to it for evaluation and qualification by Addus regardless of whether the patients were actually qualified for care or not.  Indeed, in some cases, physicians from HPG signed home care orders and other forms without ever seeing patients.

81.     Addus then billed and/or submitted requests for payment for skilled services that were performed on patients that it knew were ineligible and had only been "qualified" at its behest by HPG.  As a result of the foregoing, Addus knowingly submitted or caused to be submitted to the federal government false or fraudulent claims for payment.

82.     By virtue of the acts described above, Addus knowingly presented or caused to be presented to an officer or employee of the United States false or fraudulent Medicare claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1), as amended by 31 U.S.C. § 3729(a)(1)(A).

83.     By reason of the foregoing, the United States has suffered actual damages and is entitle to recover treble damages plus a civil monetary penalty for each false claim.

## JURY TRIAL DEMANDED

84.     Relator demands a jury trial.

## PRAYER FOR RELIEF

WHEREFORE, Relator prays that the Court enter judgment against Defendants as follows:

(a) that the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims alleged within this Complaint, as the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*/provides;

(b) that civil penalties of $11,000 be imposed for each and every false claim that Defendants caused to be presented to the United States and/or its grantees, and for each false record or statement that Defendants made, used, or caused to be made or used that was material to a false or fraudulent claim;

(c) that attorneys' fees, costs, and expenses that Relator necessarily incurred in bringing and pressing this case be awarded;

(d) that Relator be awarded the maximum amount allowed to it pursuant to the False Claims Act; and

(e) that this Court such other and further relief as it deems proper.

DATED: December 19, 2013        Respectfully submitted,

**LASKY & RIFKIND, LTD.**

Norman Rifkind
Amelia S. Newton
351 W. Hubbard St., Suite 401
Chicago, Illinois 60654
Telephone: (312) 634-0057
Facsimile: (312) 634-0059

*Local Counsel for Relator*


**THE WEISER LAW FIRM, P.C.**
Robert B. Weiser
Christopher L. Nelson
James M. Ficaro
22 Cassatt Avenue
Berwyn, PA 19312
Telephone: (610) 225-2677
Facsimile: (610) 225-2678

*Attorneys for Relator*

26