**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.*, STOP ILLINOIS MARKETING FRAUD, LLC,          Plaintiff<br>v.<br>ADDUS HOMECARE CORPORATION, and CIGNA CORPORATION,          Defendants. | ) ) ) ) ) ) ) ) ) ) ) )    No. 13 CV 9059<br><br>   Judge Rebecca R. Pallmeyer |

## MEMORANDUM OPINION AND ORDER

This is a False Claims Act action, charging Defendant home health care providers with Medicare fraud. Relator Stop Illinois Marketing Fraud, LLC, filed a complaint under the False Claims Act ("FCA"), 31 U.S.C. § 3729, alleging that Defendants Addus HomeCare Corporation ("Addus") and Cigna Corporation ("Cigna") engaged in multiple schemes to provide kickbacks in exchange for patient referrals; falsely certified compliance with the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b; and submitted reimbursement claims and records to Medicare for services provided to unqualified patients. Both Defendants have moved to dismiss the complaint. For the reasons given below, Defendant Cigna's motion is granted and Defendant Addus's motion is granted in part and denied in part. Relator has leave to amend the complaint within 21 days.

## BACKGROUND

### I. Factual History

Relator Stop Illinois Marketing Fraud, LLC is a Delaware limited liability company formed (by whom, the complaint does not say) in 2013[1] to bring this action. (First Am. Compl. ("FAC") [32] ¶ 3.) Addus is a Delaware corporation with headquarters in Palatine, Illinois. (FAC ¶ 7.)

---

[1] Delaware entity search for Stop Illinois Marketing Fraud, LLC, STATE OF DELAWARE: DIVISION OF CORPORATIONS, https://icis.corp.delaware.gov/Ecorp/EntitySearch/ NameSearch.aspx (type "Stop Illinois Marketing Fraud, LLC" in "Entity Name" field, then click "Search").

Addus provides home health care services in nineteen states, including Illinois; Medicare ultimately reimburses Addus for many of these services. (FAC ¶ 7.) Cigna is the owner of Home Physicians Management, LLC, d/b/a Alegis Care ("HPG"), a Delaware corporation with headquarters in Bloomfield, Connecticut. (FAC ¶ 8.) HPG provides home physician services to the elderly and disabled in several states, including Illinois. (FAC ¶ 8.) Cigna acquired HPG in September 2013; Relator alleges, without elaboration, that Cigna is HPG's successor-in-interest. (FAC ¶ 8.)

Many of Relator's allegations are based on the statements of Confidential Witness 1 ("CW1"), who was an Addus employee from November 2010 through April 2012, and is now employed bv Relator. (FAC ¶¶ 3, 69.) CW1 worked for Addus as an Account Executive, the title Addus assigned to "sales personnel who market home health in specific regions." (FAC ¶ 3.) CW1's specific region was in southern Illinois. (FAC ¶ 69.)

A.    Unskilled and Skilled Home Health Services

Addus provides two broad categories of services. The first are unskilled services, such as bathing, grooming, feeding and dressing assistance, meal preparation, housekeeping, and transportation. (FAC ¶ 26.) These services are known as unskilled because they do not require a nurse. (*See* FAC ¶¶ 57–58.) Most of the unskilled services Addus provides are reimbursed through Medicaid, which is administered by individual states. (FAC ¶¶ 27–28.) Addus also provides what are called skilled services. (FAC ¶¶ 31, 36–40.) Skilled services are reimbursed by Medicare, which is administered by the federal government; the claims at issue in this case are Medicare claims for skilled services. (FAC ¶¶ 31–35.) Medicare has several requirements for reimbursement of skilled services. Providers must furnish basic information about the patient and services. (FAC ¶ 37.) In addition, as relevant here: (1) health care providers must certify that they personally rendered the services; (2) the patient must be "confined to the home;" (3) and the services must be "reasonable and necessary." (FAC ¶¶ 37–38.)

### 1. Personally Rendered by the Health Care Provider

To submit a claim to Medicare for skilled services, Addus must submit a form signed by both the physician ordering the skilled services and a nurse from a home health agency, such as Addus, who actually provides the services. (FAC ¶¶ 39–40.) Skilled services are billed to Medicare in 60-day increments. (FAC ¶ 38–39.) Thus, after 60 days, providers must re-certify the patient's need for skilled services for a longer period of time. (FAC ¶ 38–39.)

### 2. "Confined to the Home"

To qualify for Medicare coverage of skilled services, the patient must meet several requirements, including that the patient be "confined to the home" (also known as "homebound"). (FAC ¶ 46.) The Medicare Benefit Policy Manual specifically defines what it means to be "confined to the home." (FAC ¶¶ 47–52.) This definition has changed over the period of time described in the First Amended Complaint ("FAC"), but in every version, the definition requires that the patient is generally unable to leave the home. (FAC ¶¶ 47–52.) Providers must certify that patients are "confined to the home" to be reimbursed by Medicare. (FAC ¶ 39.)

### 3. "Reasonable and Necessary"

If a patient meets the other qualifications for Medicare skilled services, including being homebound, the patient is entitled to coverage of health services that are "reasonable and necessary." (FAC ¶¶ 53–54.) Services are reasonable and necessary, and therefore qualify as skilled, if the patient's condition or the complexity of the services require a registered nurse. (FAC ¶¶ 55–57.) For example, bathing would not be classified as reasonable and necessary. (FAC ¶ 58.) In contrast, visits from a nurse might be reasonable and necessary for a patient who had been diagnosed with diabetes to educate the patient about the condition. (FAC ¶ 58.)

### B. Addus's Provision of Skilled Services

Relator alleges that Addus earns a gross margin (the amount of profit it makes for a given unit of its services) for skilled services nearly double the amount it earns for unskilled

services.  (FAC ¶ 63.)  In 2007, Addus made a concerted effort to increase its skilled services revenue.  (FAC ¶¶ 64–65.)  Staff involved with this effort included Care Coordinators, who worked inside senior living facilities to sign residents up for skilled services, and Account Executives like CW1, who managed several Care Coordinators.  (FAC ¶¶ 70–71.)  The effort was successful; Addus substantially grew the skilled services portion of its revenue from 2007 to 2012.  (FAC ¶ 66.)  In February 2013, Addus entered into an asset purchase agreement to sell most of the assets in its skilled services group in several states, including Illinois; the transaction was completed on March 1, 2013.  (FAC ¶ 67.)

### C.    Anti-Kickback Statute

The Anti-Kickback Statute ("AKS") prohibits soliciting, receiving, offering, or paying any "remuneration" in exchange for referring a patient for services that are reimbursed by a federal health care program.  42 U.S.C. § 1320a-7b(b).  The goal of the statute is to ensure that compensation for referrals does not affect patient care.  (FAC ¶ 15.)  A submitted claim that violates the AKS also violates the False Claims Act.  42 U.S.C. § 1320a-7b(g).  When a health care provider submits a claim to Medicare, he or she must certify that the claim complies with all Medicare regulations, including the Anti-Kickback Statute.  (*Health Insurance Claim Form, Form CMS-1500*, CENTERS FOR MEDICARE AND MEDICAID SERVICES (rev. Feb. 1, 2012), https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/CMS1500.pdf.)  Thus, to receive or provide kickbacks to influence referrals for Medicare patients would necessarily require a false statement in the CMS 1500 form, resulting in a violation of the False Claims Act.

### D.    Alleged Fraudulent Schemes

#### 1.    Essington Place Referral Scheme

Relator claims that several members of Addus's senior management team (Cindi Starek, Georjean Sweis, Donna McNally, Jim Szymanski, and Julie Hearst) were the authors of an alleged scheme to provide marketing services to senior living facilities in exchange for referrals

from these facilities of Medicare patients for skilled services.[2]  (FAC ¶¶ 71, 72.)  CW1's role at Addus was to provide those marketing services to particular senior living facilities working to increase their occupancy.  (FAC ¶¶ 74, 83–87.)  In return for Addus's marketing efforts, Relator alleges, the facilities "would exclusively refer and recommend all of the facility's patients to Addus, and not to other home health companies."  (FAC ¶ 88.)

Essington Place, an independent living facility owned by an organization that operates several such facilities, was one of the senior residential facilities where Addus assigned CW1.  (FAC ¶¶ 90–92.)  CW1 worked directly with Essington Place managers, Debra and Steve Kroll, to find and retain residents.  (FAC ¶¶ 100–103.)  Relator alleges that the Krolls "specifically agreed to refer any and all Essington Place residents to Addus for skilled and unskilled for [sic] home care in exchange for Addus' assistance in increasing their facility's occupancy."  (FAC ¶ 104.)  Relator quotes e-mails in which Addus employees discussed their goal to increase Essington Place's occupancy.[3]  (FAC ¶¶ 106–11, 126–35, 144–48.)  As part of this scheme, CW1 and Addus would try to discourage seniors from leaving Essington Place for a facility that provided more dedicated skilled care.  (FAC ¶¶ 112–25.)  CW1 personally marketed Addus's skilled services to patients who lived at Essington Place but were considering a move to an assisted living facility that provided skilled care services itself.  (FAC ¶¶ 112–25.)  Addus employees, including CW1, also marketed its skilled services directly to potential residents when they toured Essington Place.  (FAC ¶¶ 137–42.)

Addus staffed a "wellness center" at Essington Place and paid rent for an apartment to use for this purpose, paying an amount below the market rate for such apartments.  (FAC

---

[2] Starek was an Agency Administrator, Sweis was a National Director, McNally was a Vice-President of Service Integration, Szymanski was a Regional Director of Sales, and Hearst was an Account Executive like CW1.  (FAC ¶ 72 n.2.)

[3] For example, in a December 1, 2010 email with the subject "Essington Place Joliet," Hearst wrote, "This is not about what referrals they can give to us—that will come.  This is about our commitment to do external marketing with them.  They have the lowest occupancy [of facilities in the company that operates Essington Place]."  (FAC ¶ 110.)

¶¶ 151–60.)  Addus scheduled free screenings and assessments for residents in order to market its services.  (FAC ¶¶ 161–65.)  Relator further claims that Addus "encouraged" its employees to buy meals and gifts for facility personnel (Relator does not say whether CW1 specifically received such encouragement).  (FAC ¶ 172.)  Finally, Relator alleges that Addus offered skilled services to residents even if they were not "homebound."  (FAC ¶¶ 168–70.)

CW1 has identified eight patients, by their initials, whom she claims Essington Place referred to Addus as part of this scheme.  (FAC ¶ 143.)  Relator also quotes e-mails that identify additional referred patients, along with a date and the designation "SOC" or "start of care," indicating that Addus provided services to these patients, as well.  (FAC ¶¶ 145–47.)

### 2. Referral Schemes at Other Facilities

Relator alleges that CW1 was present at meetings in which Addus senior management discussed similar referral schemes at other facilities.  (FAC ¶ 149.)  The e-mails quoted in the FAC also allude to "more opportunities for all of us as we continue in other retirement communities."  (FAC ¶ 148.)  In fact, Relator alleges, Addus replicated the scheme at two other facilities, identified as Church Creek and Tamrac, as well as at "a Holiday Retirement Community in Palatine, Illinois, and twenty two (22) facilities within the Chicago areas owned by Senior Lifestyle Corporation, and facilities owned by Sunrise Senior Living."  (FAC ¶ 176.)  CW1 discussed Addus's referral scheme with Addus employees who worked with Sunrise Senior Living.  (FAC ¶¶ 177–180.)  Relator does not, however, identify particular patients that other facilities referred to Addus.

### 3. Referral Scheme with Dr. Dick

Relator alleges that in 2011, an Addus Account Representative,[4] Brianne Zitko, asked a physician named Dr. Dick "what it would take to get referrals from him."  (FAC ¶ 185.)  Dr. Dick "mentioned" that his daughter was looking for a job; soon afterwards, Dr. Dick's daughter,

---

[4]     Relator does not explain the role of an Account Representative or the relationship between that position and the Account Executive position held by CW1.

Jaycee Dick, was hired by Addus. (FAC ¶ 186.) During the eight months while Jaycee Dick worked there, Addus received "numerous patient referrals" for skilled services from Dr. Dick, but those referrals stopped when Jaycee Dick stopped working for Addus. (FAC ¶¶ 187–88.) Relator asserts that "[a]ny patients referred to Addus by Dr. Dick were thus necessarily tainted by" Jaycee Dick's employment. (FAC ¶ 191.) Relator claims that she learned about this scheme from Jaycee Dick and Brianne Zitko themselves. (FAC ¶ 189.)

### 4. Scheme to Certify Ineligible Patients

Soon after CW1 began working for Addus in November 2010, someone in Addus management—Relator does not say who—told CW1 that she should solicit all seniors for skilled services, even if they did not meet Medicare's requirements. (FAC ¶¶ 200–05.) Relator alleges that Addus strongly encouraged its employees to market skilled services to patients, and quotes one of Szymanski's e-mails to that effect.[5] (FAC ¶¶ 208–16.) Addus specifically directed these efforts toward Medicare patients. (FAC ¶ 220.) Relator claims that Medicare reimbursed Addus for skilled services simply because many providers were willing to sign the Medicare reimbursement form even if the patient was not qualified. (FAC ¶¶ 206, 229–41.) CW1 personally observed Addus employees prepare these forms, often exaggerating diagnoses and

---

[5]  Szymanski wrote:
    I have talked to everyone in the region and I keep hearing "IT IS SLOW OUT THERE"…………
    What is SLOW ? I don't know what the term "SLOW" means…… I can tell you what SLOW is:
    SLOW is making sure you have a diversification in your accounts. For example, [i]f hospitals are lagging behind with discharges, then you have to have a diversification of physicians, skilled nursing facilities, assisted living facilities, independent living communities, all making referrals……… Don't put all your apples in one basket and that is what I have seen this month.
. . . .
    Slow is also a[n] opportunity to educate and identify patients to your referral sources. You should constantly be educating your referral sources on the types of patients that are appropriate for HH services.
    Slow is making even more calls per day. Target yourself to make contact with 14 to 16 decision makers per day. Activity breeds results. There is no such thing as luck. OPPORTUNITY + PREPARATION = LUCK[.]
(FAC ¶ 212) (first three ellipses in original).

persuading physicians to sign, "hundreds of times." (FAC ¶¶ 238–242.) She also saw non-homebound seniors at Essington Place receive Medicare-reimbursed skilled services. (FAC ¶ 243–44, 251.) Relator identifies seven seniors (again by initials) who allegedly received skilled services but were unqualified for them—it does not specify whether they lived at Essington Place. (FAC ¶¶ 253–54.)

CW1 had no direct involvement with patient care beyond soliciting patients for Addus's skilled services and had no access to any billing paperwork. (FAC ¶¶ 250, 252.) Yet a portion of her earnings consisted of commissions based on the number of "starts of care" for patients who were covered by Medicare. (FAC ¶ 197.) Care Coordinators also received bonuses for skilled services "starts of care" or for converting patients from unskilled services to skilled services. (FAC ¶ 217–18.)

Addus more than doubled its revenue from skilled services from 2008 to March 2013. (FAC ¶ 210.) Essington Place's occupancy also increased by over 20% during the course of the scheme. (FAC ¶ 245.) Relator alleges that at the time CW1 began her involvement with Essington Place, Addus did not provide any skilled services to its residents. (FAC ¶ 246.) By the time CW1 left Addus, Addus had provided skilled services to thirty Essington Place residents, all reimbursed by Medicare. (FAC ¶ 246.) Relator alleges that Addus had similar success at the other facilities with parallel schemes. (FAC ¶ 248.)

### 5. Referral Scheme with HPG

In some cases, a patient's regular physician declined to sign off on the Medicare certification forms that Addus provided. (FAC ¶¶ 259–62.) Addus would then arrange for an HPG physician to visit the patient's home and sign the certification form; Relator alleges that HPG physicians did so even when a patient was unqualified for Medicare-reimbursed skilled services. (FAC ¶¶ 258–64, 269.) In exchange, Addus would refer all patients who needed physician care to HPG; this enabled HPG to bill Medicare for its own visits with the patients. (FAC ¶¶ 265–66.) HPG allegedly certified every single patient referred by Addus for Medicare

skilled care. (FAC ¶ 270.) CW1 cannot identify specific claims because she does not have access to HPG records, but Relator alleges, on information and belief, that HPG submitted claims to Medicare for services provided to Addus-referred patients. (FAC ¶¶ 267–68.) Addus eventually created a call center to centrally process all the referrals. (FAC ¶¶ 271–73.)

According to Relator, HPG participated in this scheme because the then-CEO of HPG, Craig Reiff, "had close personal and business ties to senior management at Addus, including Mark Heaney, Addus' president and CEO" (FAC ¶ 275), and because Addus was a large source of business for HPG. (FAC ¶¶ 276–80.) Relator alleges that this referral scheme was exclusive and when on one occasion, CW1 attempted to get a non-HPG physician to assess a patient, she was criticized for doing so. (FAC ¶ 282.) Finally, Relator alleges that all the claims submitted by either HPG or Addus as a result of this arrangement violated the AKS, and the FCA by extension. (FAC ¶ 286.)

### 6. Resulting Medicare Starts of Care

Relator alleges that she arranged approximately 114 starts of care during 2011, and that approximately 35% of these patients lived at Essington Place. (FAC ¶ 289.) Relator does not explicitly say whether these patients were Medicare recipients, but does allege that more than 75% of these patients did not qualify for Medicare-reimbursed services. (FAC ¶ 289.) Relator breaks these 2011 starts of care into two groups. The first consists of approximately 67 starts of care from January to July 2011. (FAC ¶ 290.) Relator does not identify any particular patient by name or location, but notes that patients in Essington Place are "readily identifiable" through Addus's records system. (FAC ¶ 290.) The second group consists of 54 starts of care from August to November 2011,[6] where Relator identifies patients by initials and by the month in which their care started; as with the first group, Relator explains that Essington Place residents can be identified in Addus's records system. (FAC ¶¶ 291–96.)

---

[6] Though Relator identifies approximately 114 starts of care for all of 2011, it makes no mention of the starts of care for December of that year.

## II. Procedural History

Relator filed its original complaint, pleading violations of the False Claims Act, under seal on December 19, 2013. (Compl. [1].) In the original complaint, Relator did not mention specific facilities by name, nor that Addus engaged with facilities for referrals. Instead, it alleged that Addus sought to establish wellness centers in senior living facilities, and used these wellness centers to solicit Medicare-covered seniors to accept Addus services. (Compl. ¶ 38–55.) The original complaint did allege that Addus sought to provide Medicare-reimbursed skilled services to unqualified patients, and encouraged its employees to provide gifts and meals to facility personnel. (Compl. ¶ 55–58.) The original complaint also described the scheme to certify unqualified patients (Compl. ¶ 59–67), and the agreement with HPG to certify patients in exchange for Addus's business. (Compl. ¶ 68–78.)

On December 18, 2015, the United States provided notice that it would not intervene in the case. (Notice of the United States [12].) On April 4, 2016, Relator filed the FAC, alleging, against all Defendants, violations of the False Claims Act through the submission of false claims (Count I) and false records and/or statements (Count II), and conspiracy to violate the False Claims Act (Count III).[7] (FAC ¶¶ 298–320.) Each Defendant moved to dismiss the FAC on June 6, 2016. (Def. Cigna's Mot. to Dismiss [33]; Def. Addus's Mot. to Dismiss [36].)

## DISCUSSION

Both Cigna and Addus have moved to dismiss. The court addresses their motions in turn.

---

[7] Relator alleges that Defendants have also violated the Illinois False Claims Act, but address this potential cause of action only briefly: "Defendants also violated Illinois law, which contains an analogous anti-kickback provision. *See* 305 ILCS 5/8A-3. Therefore, Defendants have also violated the Illinois False Claims Act. *See* Illinois False Claims Act, 740 ILCS 175/1 *et seq.*" (FAC ¶ 25.) This barebones allegation is a legal conclusion and makes no reference to the elements of such a cause of action. Defendants understandably do not address this conclusory allegation, and any such cause of action is dismissed without prejudice.

## I.    Claims Against Cigna

Relator's sole allegation against Cigna is that Cigna is liable for the conduct of its subsidiary, HPG.  These allegations are insufficient to state a claim against it, Cigna contends.  Relator's response to this argument is not satisfying.  Relator first claims that "the FAC does not allege that the fraud ever ended."  (Pl.'s Opp. to Def. Cigna's Mot. to Dismiss ("Opp. to Cigna") [39] 5).  Second, Relator argues that the FAC sufficiently pleads that Cigna is HPG's successor-in-interest.

Notably, Relator's first argument, that the fraud may be ongoing, has no basis in the FAC with respect to Cigna or HPG.  The contention that the fraud may be ongoing is based solely on the allegation that "from at least 2008 through 2013, Defendants illegally billed the Government for, collected, and profited tens of millions of dollars."  (FAC ¶ 2.)  This date range refers to all of the alleged fraudulent schemes—as described above, there are several.  But HPG's role is limited to one scheme: to falsely certify patients as qualified for skilled services in exchange for referrals from Addus.  (FAC ¶¶ 255–87.)  The FAC alleges that Addus "virtual[ly]" ceased providing skilled services in March 2013, when it sold its skilled services group.  (FAC ¶ 67.)  Thus, any scheme in which HPG provided certification for skilled services also ceased in March 2013.[8]  The allegation that Addus's skilled services "virtually" ceased, as opposed to completely ceased, is not sufficient to allege that the fraud is ongoing.  Because Cigna acquired HPG in September 2013, HPG's involvement in the fraud ended before Cigna acquired it.

Furthermore, even if the FAC did allege that HPG's role in the fraud continued, Relator would still need some basis to hold Cigna liable.  "[P]arent corporations are not liable for the wrongs of their subsidiaries unless they cause the wrongful conduct (and so are directly liable) or the conditions of investors' liability ('piercing the corporate veil') have been satisfied."  *Bright*

---

[8]    In contrast, unskilled services, rather than being reimbursed by Medicare, are reimbursed by the state-administered Medicaid program.  (FAC ¶¶ 26–27.)  In fact, the FAC alleges that Medicare will not reimburse unskilled services—it reimburses only reasonable and necessary skilled services.  (FAC ¶¶ 31–61.)  The complaint contains no allegations about any certification that may be required for Medicaid reimbursement for *unskilled* services.

*v. Hill's Pet Nutrition, Inc.*, 510 F.3d 766, 771 (7th Cir. 2007); *see also United States v. Bestfoods*, 524 U.S. 51, 61 (1998) ("It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries.") (internal citations and quotation marks omitted). The FAC must, therefore, contain some allegation that would make Cigna liable for HPG's alleged fraud.

Relator's only gesture in this direction is the assertion that Cigna is HPG's successor-in-interest. (FAC ¶ 8.) A successor-in-interest theory "allows lawsuits against even a genuinely distinct purchaser of a business if (1) the successor had notice of the claim before the acquisition; and (2) there was 'substantial continuity in the operation of the business before and after the sale.'" *Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Tasemkin, Inc.*, 59 F.3d 48, 49 (7th Cir. 1995) (quoting *E.E.O.C. v. G-K-G, Inc.,* 39 F.3d 740, 748 (7th Cir. 1994)). But Relator pleads no facts that show that either element is satisfied.

In its opposition to Cigna's motion, Relator argues that Cigna had notice of possible claims because Cigna and HPG had a four-year partnership prior to the acquisition. There is no reference to this partnership in the FAC, however; Relator's brief instead cites news stories that reference the partnership. (Opp. to Cigna 6 & n.3.) Materials outside the pleadings are ordinary not considered on a motion to dismiss. *See Greenpoint Mortg. Funding, Inc. v. Family First Mortg., Inc.*, No. 05 C 4498, 2007 WL 2608554, at *6 (N.D. Ill. Sept. 4, 2007); FED. R. CIV. P. 12. In any event, these articles do not describe any details of the partnership that indicate how it would have put Cigna on notice of HPG's alleged fraud. They describe "a partnership that proved fruitful for both," a "relationship" between HPG and an entity acquired by Cigna in 2012, and a "successful relationship and results [Cigna] shared with [HPG] since 2009."[9] The court

---

[9]     Steven Dashiell, *Cigna-Alegis Acquisition Portrays the Growing Importance of Embedded Case Management*, DORLAND HEALTH, http://www.dorlandhealth.com/dorland-health-articles/CIP_1013_11_ManagedCarexml (last visited Jan. 31, 2017); Rachel Landen,

has no information about the nature or extent of this partnership, and Relator cites no authority holding that the mere existence of some business relationship establishes notice.

Relator also argues that Cigna was on notice of the fraud because of its "sheer scope and pervasiveness." (Opp. to Cigna 7.) Relator cites to no authority regarding how much "pervasiveness" constitutes notice. Complaints that sufficiently alleged notice generally explain why a successor should suspect fraud. For example, in *United States ex rel. Geschrey v. Generations Healthcare, LLC*, 922 F. Supp. 2d 695, 709 (N.D. Ill. 2012), a relator, an employee of the acquiring entity, allegedly told another employee that the relator thought the subsidiary was "dirty," and the other employee later told the relator that the parent knew there were "problems" with the subsidiary. The court noted that the relator "does not allege that she told [the employee] that there was any pending litigation or that [the subsidiary] was engaged in a specific fraudulent scheme." *Id.* The court acknowledged "[t]hese communications in themselves might not suffice to establish notice," but found the allegations sufficient when combined with the fact that the parent employed the entire subsidiary staff. *Id.*; *see also Chicago Truck Drivers*, 59 F.3d at 49 (finding notice when the former registered agent for the original entity became the president and secretary of the new entity). Here, the FAC alleges nothing like such suspicious conversations, nor whether any HPG employees remained after March 2013 or after Cigna acquired HPG.

Instead, Relator points to numerous allegations about HPG's and Addus's relationship that it claims should have alerted Cigna to HPG's alleged fraud:

> (i) HPG certified "100% of the patients sent [to it] by Addus" and . . . this was well-known within Addus and regularly discussed at meetings (¶¶269-270); (ii) Craig Reiff, HPG's CEO[,] e[-]mailed his senior employees and stressed the importance of Addus to HPG, describing it as "Illinois' 'largest' home health care company, one of HPG's 'top ten' referral sources, and a 'Priority Account' for HPG" (¶276); (iii) Mr. Reiff had a "strong personal relationship" with senior managers at Addus and attended Addus internal meetings (¶¶270-280); and (iv)

*Cigna Acquires Home Healthcare Company Alegis*, Modern Healthcare, http://www.modernhealthcare.com/article/20130903/NEWS/309039962 (last visited Jan. 31, 2017).

HPG was Addus' exclusive provider of physicians to certify patients that other physicians had refused to certify (¶¶282-285).

(Opp. to Cigna 7.)   Relator does not allege why any of these circumstances should have triggered red flags for Cigna—getting referrals from Addus is not improper unless it was part of an illegal exchange.   It is unclear how Cigna would have known that other physicians had refused to certify Addus's patients.   HPG's certification of "100%" of Addus's referrals may be suspect, but there is no basis to infer that a high certification rate would have signaled fraud; Addus, after all, was an experienced provider of skilled services.

Relator also has not alleged sufficient continuity of operations before and after the purchase.   Relator does point out that HPG continued doing business under the same name after the acquisition.   "[A]ssumption of . . . corporate identity makes a strong case for substantial continuity."   *Chicago Truck Drivers*, 59 F.3d at 49.   In *Chicago Truck Drivers*, however, the original entity had been liquidated.   *See id.*   Here, by contrast, HPG continues to operate as a distinct entity under Cigna's ownership; Cigna did not assume HPG's corporate identity.   (*See* FAC ¶ 8.)   The fact that Cigna has not "asserted that there was any change in HPG's employees, offices, or services following the acquisition" (Opp. to Cigna 6), misstates the burden—it is up to Relator to support a successor-in-interest theory.[10]

Relator has not alleged facts sufficient to hold Cigna liable as a successor-in-interest to HPG.   Several of Cigna's other arguments may have merit, as well,[11] but the court need not address them.   Cigna's motion to dismiss is granted.

---

[10]     Other cases that Relator uses to support this argument, similarly, involved purchased entities that, unlike HPG, did not continue operating independently after the purchase.   *See Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1329 (7th Cir. 1990); *see also Steinbach v. Hubbard*, 51 F.3d 843, 845–46 (9th Cir. 1995) (finding continuity when the original company ceased operating, and the successor began operating the next day, hired all the other company's employees, leased the other company's equipment, but eventually stopped doing so and ceased its attempts to purchase the other company).

[11]     In particular, as explained below, Relator does not identify any particular claims that HPG itself submitted, or any patients that HPG treated or certified.   (*See* FAC ¶¶ 267–68.)

## II.    Claims Against Addus

Addus moves to dismiss all counts.  In the alternative, Addus moves to dismiss all claims based on alleged FCA violations that occurred before April 4, 2010 as time-barred.

### A.    Counts I and II: Submission of False Claims and Records

Counts I and II allege violations of the False Claims Act.   Count I alleges that Defendants submitted false claims, while Count II alleges that Defendants submitted false records and statements.  (FAC ¶¶ 299, 313).  These two counts arise from the same courses of conduct: (1) paying kickbacks and falsely certifying compliance with the AKS, and (2) falsely certifying patients as eligible for home health care services, thus violating Medicare conditions of payment.[12]  (FAC ¶¶ 302, 304, 311.)  The court addresses Counts I and II together, because a false claim would necessarily involve submission of a false record under the alleged conduct, and if any records in a submitted claim were false, the claim would have been false as well.

#### 1.    Anti-Kickback Statute

The FAC alleges that Addus both paid kickbacks and falsely certified compliance with the AKS.  In doing so, the FAC describes four kickback schemes: (1) Addus allegedly provided marketing services to Essington Place in exchange for referrals; (2) Addus provided marketing services to other facilities for referrals; (3) Addus employed Dr. Dick's daughter, in exchange for referrals; and (4) Addus accepted false Medicare certifications from HPG in exchange for referrals to HPG.[13]   Cigna makes two threshold arguments regarding the alleged kickback

---

[12]    Relator casts falsely certifying patients and violating Medicare conditions of payment as separate courses of conduct, but they are essentially the same behavior: certifying patients as eligible for skilled services without following Medicare's certification requirements.

[13]    This last kickback scheme involves Addus receiving kickbacks.  The FAC alleges that Addus violated the FCA by *paying* kickbacks in violation of the AKS, but does not specifically state that Addus violated the FCA by *receiving* kickbacks.  (*See* FAC ¶¶ 302, 304.) The AKS, however, also prohibits *receiving* remuneration in exchange for referrals.  42 U.S.C. § 1320a-7b(b)(1)(A) and (2)(A).  Violations of the AKS are also violations of the False Claims Act, 42 U.S.C. § 1320a-7b(g), so this deficiency does not doom this final alleged kickback scheme, because the court can infer that Addus certified that it complied with the AKS to receive reimbursement from Medicare.  (*Cf.* FAC ¶¶ 19, 21.)  Thus, if Addus received kickbacks for

15

schemes, and although Cigna has already been dismissed, Addus incorporates these arguments by reference (Mem. in Supp. of Def. Addus's Mot. to Dismiss ("Addus Mem.") [37] 1 n.1), so the court addresses them.

### a. Certifying Compliance

First, Defendants argue that the FAC does not allege that certifying compliance with the AKS is a condition of payment under Medicare. But the FAC does specifically assert "[c]ompliance with the Anti-Kickback Statute is a condition of payment under federal health care programs" (FAC ¶ 19); Medicare is such a program. Defendants appear to believe that Relator must allege that *certifying* compliance with the AKS, not just compliance, is a condition of payment. This is unnecessary; as one of the cases that Cigna itself cites recognizes, "[p]articipation in federal Medicare and Medicaid programs requires healthcare providers to submit . . . certifications attesting to their compliance with anti-kickback laws." *Mason v. Medline Indus., Inc.*, No. CIV.A. 07 C 5615, 2009 WL 1438096, at *1 (N.D. Ill. May 22, 2009); (*see also Health Insurance Claim Form, Form CMS-1500*, CENTERS FOR MEDICARE AND MEDICAID SERVICES (rev. Feb. 1, 2012), https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/CMS1500.pdf.) That a party claiming reimbursement from a government program must certify that it has complied with all conditions of that program is not an inferential stretch.

### b. What Constitutes Remuneration

Second, Defendants argue that the referral arrangement between HPG and Addus does not violate the AKS because certifying compliance with Medicare requirements is not remuneration. (Def. Cigna's Mem. in Supp. of Mot. to Dismiss ("Cigna Mem.") [34] 12–13.) An illegal referral arrangement under the AKS requires giving or receiving "remuneration" in exchange for federally-reimbursed health care referrals. 42 U.S.C. § 1320a-7b(b). Relator

---

giving referrals, but certified that it complied with the AKS, then Addus would have submitted a false claim.

asserts that the false certifications provided by HPG were themselves remuneration, in that the certifications enabled Addus to obtain the cash payments. If the patients were truly unqualified, then without HPG's false certification, Addus would have no chance of obtaining the higher revenue associated with skilled services.

Defendants challenge this interpretation. They argue that remuneration means payment or compensation. *United States v. Goldman*, 607 F. App'x 171, 174 (3d Cir. 2015) (citing *Remuneration*, Black's Law Dictionary (9th ed.2009)). Defendants reason that HPG did not pay a kickback because the cash payments came from Medicare, not HPG. Defendants do not cite any authority for the contention that remuneration must be in the form of cash or something similar, however, and the court is not inclined to read the statute so narrowly. The kickbacks in the other alleged referral schemes—marketing services and a job for a relative—can fairly be characterized as remuneration, as they are things of value to the alleged recipients. *See United States ex rel. Nehls v. Omnicare, Inc.*, No. 07 C 05777, 2013 WL 3819671, at *15 (N.D. Ill. July 23, 2013) ("[R]emuneration, for purposes of the AKS, is defined broadly, meaning 'anything of value.'") (quoting *Klaczak v. Consol. Med. Transp.*, 485 F.Supp.2d 622, 678 (N.D. Ill. 2006). Defendants emphasize that "certification is an essential part of what a provider legitimately does under the Medicare program." (Cigna Mem. 13.) But that is the point: certifications are *not* legitimate if exchanged for referrals. Cash payments and hiring a doctor's relative are also not inherently illegal, but they become illegal when they are traded for Medicare referrals. Relator alleges that HPG certified patients for skilled services not because the patients qualified, but because Addus referred them.

Defendants attempt to distinguish the facts here from what they call "classic kickback" scenarios, where the entity that bills the federal health program then pays money to the referral source. For example, in *United States v. Hancock*, 604 F.2d 999, 1001 (7th Cir. 1979), a laboratory paid "handling fees" to two chiropractors, who used the laboratory to analyze tissue samples. The court concluded that these handling fees were kickbacks. *Id.* at 1001–02.

Similarly, in *United States v. Greber*, 760 F.2d 68, 70 (3d Cir. 1985), a company provided diagnostic services, billed Medicare for them, and then gave a portion of that fee to the referring physician. Defendants also distinguish these facts from cases where the remuneration was the opportunity to bill for services *not* performed, thus obtaining wholly unearned revenue, *see, e.g.*, *U.S. ex rel. Daugherty v. Bostwick Labs.*, No. 1:08-CV-00354, 2012 WL 6593804, at *11–12 (S.D. Ohio Dec. 18, 2012). As *Hancock* and *Greber* demonstrate, however, HPG's certification can constitute a kickback even though Addus actually rendered the services that it billed to Medicare. 604 F.2d at 1001–02; 760 F.2d at 72. Billing for services actually provided does not sanitize a kickback.

Defendants also argue that the certifications are not remuneration because they bring Addus only the mere expectation (or possibility) of payment. Those certifications have obvious value, however. The FAC alleges that HPG certified patients who were not in fact qualified for Medicare skilled services. HPG's certifications enabled Addus to seek reimbursement for the services. *United States ex rel. Fry v. The Health Alliance of Greater Cincinnati*, No. 1:03-CV-00167, 2008 WL 5282139, at *1 (S.D. Ohio Dec. 18, 2008), is most factually similar to this case. There, the relator alleged that a hospital "assigned time to cardiologists in the hospital's heart station in proportion to the volume of referral of cardiac procedures made by cardiologists to [the hospital]." *Id.* Relators claimed that time at the heart station was remuneration because it "would have given [doctors] additional patients, [and] opportunities to bill for those additional patients[.]" *Id.* The court found that this time at the heart station was remuneration because it gave the doctors the opportunity to earn more money. *Id.* at *7–8. Under the allegations here, Addus would never have earned the same amount of money without the referral scheme.[14] HPG's patient certifications can be remuneration under the AKS.

---

[14]   For this reason, *United States v. Pikus*, No. 13 CR. 25 BMC, 2015 WL 3794456, at *1 (E.D.N.Y. June 17, 2015) and *U.S. ex rel. Kosenske v. Carlisle HMA, Inc.*, No. CIV.A. 1:05-CV-2184, 2007 WL 3490537, at *1 (M.D. Pa. Nov. 14, 2007), *rev'd and remanded*, 554 F.3d 88 (3d Cir. 2009) do not support Defendants' argument. *Pikus* simply involves a classic kickback

### c.    AKS Schemes and Rule 9(b)

Defendants argue that Relator's allegations do not satisfy Rule 9(b). Actions under the False Claims Act must be pleaded with particularity, "which 'means the who, what, when, where, and how: the first paragraph of any newspaper story.'" *U.S. ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009) (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)). "[M]uch knowledge is inferential[,]" however. *Id.* at 854. In *Lusby*, the complaint pleaded "specific parts shipped on specific dates, and it relates details of payment[;]" the court found this was sufficient and did not require the relator "to produce the invoices (and accompanying representations) at the outset of the suit." *Id.* "[A] plaintiff does not need to present, or even include allegations about, a specific document or bill that the defendants submitted to the Government." *U.S. ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 777 (7th Cir. 2016). But as Addus contends, under *Lusby* a relator must do more than simply alleging generally that claims were submitted. (Addus Mem. 7.) Indeed, Relator must plead *some* details about submitted claims, sufficient to support an inference of false claims. *See Lusby*, 570 F.3d at 853–54.

Courts have generally agreed that when a relator pleads lengthy fraudulent schemes, the relator need only allege representative examples of the fraud with particularity. *See, e.g.*, *U.S. ex rel. Dolan v. Long Grove Manor, Inc.*, No. 10 C 368, 2014 WL 3583980, at *3 (N.D. Ill. July 18, 2014); *U.S. ex rel. Obert-Hong v. Advocate Health Care*, No. 99 C 5806, 2001 WL 303692, at *3 (N.D. Ill. Mar. 28, 2001). The parties agree that is the standard here. (Addus Mem. 7–8; Opp. to Addus 3.)

---

scenario and contains no analysis of the remuneration issue. *Pikus* at *1. In *Kosenske*, the court, in a footnote without analysis, "express[ed] its doubts" that the expectation of payment could be remuneration, but did not rely on these doubts because it found other forms of remuneration. *Kosenske* at *7 & n.9. Further, neither of these cases alleged facts where at least some of the expectation of payment was for services that were not medically necessary and could not otherwise have been paid.

*United States ex rel. Grenadyor v. Ukrainian Village Pharmacy, Inc.*, 772 F.3d 1102 (7th Cir. 2014), provides an illustrative example.  In that case, the relator alleged that "the pharmacy defrauded the government by making gifts to customers (such as tins of caviar), or forgiving their copays (even if they were not entitled under the law to such forgiveness), in order to induce them to have their prescriptions filled by it rather than by competing pharmacies."  *Id.* at 1104. The district court dismissed the complaint on other grounds, but the Court of Appeals affirmed on the basis that the complaint did not satisfy Rule 9(b).  *Id.* at 1105–06.  The Court of Appeals explained that the relator should have identified a specific patient who was the subject of a kickback, and stated that a claim was submitted to Medicare (or Medicaid) for that patient.  *Id.* at 1107.  Strictly construed, then, Rule 9(b) requires that for each scheme, Relator must identify a specific patient referred in exchange for a kickback, and allege that a claim was submitted to Medicare for that patient.

### i.    Referral Scheme with Essington Place

In the context of the first alleged kickback scheme, Relator must allege that Addus provided skilled services to a specific Essington Place patient as part of the marketing-services-for-referrals scheme, and that Addus claimed reimbursement from Medicare for that patient. The FAC describes the detailed scheme with Essington Place[15] (FAC ¶¶ 81, 85–88, 91–93, 98–104, 115–25), and identifies specific patients referred as part of this exchange.  (FAC ¶ 143.) The FAC also names patients who were referred and to whom Addus provided services—these patients are identified in e-mail excerpts.  (FAC ¶¶ 145, 147.)

Addus argues that these allegations are insufficient under Rule 9(b) because Relator does not identify specific claims submitted to Medicare.  Ordinarily, this would be problematic. But "when details of the fraud itself 'are within the defendant's exclusive knowledge,' specificity

---

[15]    Addus complains that Relator does not define "Medicare referral" and "Medicare start of care" when describing the scheme.  (Addus Mem. 9.)  This is far from a fatal flaw.  The context of the FAC makes it clear that "Medicare referral" means the referral of a patient who receives health insurance through Medicare, and "Medicare start of care" means the initiation of skilled services for a patient who is covered by Medicare.

requirements are less stringent." *Goldberg v. Rush Univ. Med. Ctr.*, 929 F. Supp. 2d 807, 815 (N.D. Ill. 2013) (quoting *Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1328 (7th Cir. 1994)). Here, Relator explained that CW1 was responsible only for soliciting patients who were on Medicare, and had no responsibility for billing. (FAC ¶¶ 250–52.) Addus effectively suggests that CW1 should have retained more records, but this places an unreasonable burden on relators, especially in a situation like this one, where CW1 was involved in soliciting more than a hundred patients while at Addus. (*See* FAC ¶ 289.)

Moreover, the court is satisfied that Relator's allegations both describe the scheme with particularity and support a strong inference that Addus submitted claims to Medicare for patients referred by Essington Place. First, Relator alleges that a significant amount of Addus's revenue came from skilled services reimbursements from Medicare: the FAC alleges that "Addus went from zero to dozens of Medicare referrals" in the first three months of the Essington Place scheme and significantly increased its Medicare revenue for the duration of the alleged scheme. (FAC ¶ 146; *see* FAC ¶¶ 210, 245–46.) Second, Relator infers that Addus submitted many claims to Medicare because Addus paid CW1 bonuses for each Medicare patient to whom Addus provided skilled services. (FAC ¶¶ 197, 199, 252, 300.) Third, Relator identifies 54 specific Medicare starts of care in a mere four-month period from August to November 2011; though the FAC does not specify that these were all at Essington Place, it allows the inference that many of Addus's patients were covered by Medicare. (FAC ¶¶ 291–295.) Finally, Relator alleged that Addus's billing system can identify specific patients whose claims were submitted to Medicare. (FAC ¶ 290.) Addus alone has access to its billing system from which these patients are most easily identified; CW1 does not, and apparently never had, access to this system.

These allegations amply support an inference that at least one of the twelve specific patients that Essington Place referred (FAC ¶¶ 143–47) had claims submitted to Medicare. Although Relator has not explicitly alleged that Addus submitted a Medicare claim for these twelve patients, Relator has provided enough information to the court about specific patients

who received care and the quantity of claims submitted to Medicare generally to meet the requirements of Rule 9(b).

*United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770 (7th Cir. 2016) is instructive. In that case, the relator alleged that "[a defendant] had told her 'that almost all of Acacia's patients . . .' dealt with Medicare[,]" and that "the questionable practices and procedures were applied to all patients at the clinic." *Id.* at 778. The district court dismissed the complaint on the grounds that the relator "had not alleged that the defendants actually sent any of the alleged claims or made any of the alleged statements" to the government. *Id.* at 777. The Court of Appeals reversed, holding that the relator's allegations were sufficient to infer that the defendants had billed Medicare. *Id.* at 778. Of particular import for this case, the court noted that the relator did not have access to billing information, and the court "d[id] not see how she would have been able to plead more facts pertaining to the billing process." *Id.* Here, similarly, Relator has alleged that enough claims were submitted to Medicare, and lacked access to further information, to pass Rule 9(b).

Addus cites several cases that passed 9(b)'s hurdle with more detail, but these cases do not set a 9(b) threshold. In *United States ex rel. Litwiller v. Omnicare, Inc.*, No. 11-CV-8980, 2014 WL 1458443, at *10 (N.D. Ill. Apr. 14, 2014), "Relator set[] forth the claims and payments in sufficient detail in more than 16 paragraphs." The detail provided, however, was for the schemes themselves, not the submitted claims; in all but one of the six schemes alleged, the relator did not identify any specific customers as having been affected. *Id.* at *2–3. In fact, the *Litwiller* court rejected the defendant's argument for dismissal on the basis that "Relator did not give specific examples of actual false claims submitted, the date of the claim, who submitted it, the amount of the claim, where the claim was submitted from, and to whom."[16] *Id.* at *10. In

---

[16]     *United States ex rel. Kalec v. Nuwave Monitoring, LLC*, 84 F. Supp. 3d 793, 801 (N.D. Ill. 2015), is another case that passed the 9(b) hurdle with more detail than here. In one cause of action for an FCA violation, the relator alleged a bill for services on a specific date, *id.*, but the fact that such detail *can* pass 9(b) does not mean that 9(b) *requires* such detail. In

*Geschrey*, 922 F. Supp. 2d 695, similarly, the relator provided details of a scheme, but did not identify specific examples of claims with particularity. *Geschrey*, 922 F. Supp. 2d at 700, 704. But the court held:

> Despite Relators' lack of specific knowledge about billings submitted to the government, the fact that most of Generations's patients were receiving government benefits and Generations billed Medicare and Medicaid . . . for each covered patient creates a strong inference that bills for the care of patients as to whom fraud has been alleged were submitted to the government.

*Id.* at 705. In that case, as in this one, the relators "had no access to billing documents and no way to know which government program was being billed for each patient[.]" *Id.* at 706. The relators also provided allegations, as Relator here has, regarding how to access the alleged claims in the defendants' internal systems, which "[made] the alleged fraud in the billing process sufficiently clear to allow Defendants to respond to the allegations." *Id.*

In contrast, other complaints dismissed at the pleading stage included significantly less detail than the FAC. *See U.S. ex rel. Kalec v. Nuwave Monitoring, LLC*, No. 12 C 69, 2016 WL 750155, at *5 (N.D. Ill. Jan. 26, 2016) (finding no link between the representative examples of the fraudulent practices and submitting a claim because the relator did not allege that the patients had Medicare coverage or that claims were submitted for reimbursement); *U.S. ex rel. Schramm v. Fox Valley Physical Servs., S.C.*, No. 12 C 8262, 2015 WL 3862954, at *4 (N.D. Ill. June 22, 2015) (dismissing a claim due to "the lack of detail regarding matters that [the relator] would know from first-hand observation" and the relator's failure to explain how she knew that certain services were not performed). Here, Relator has explained the basis for concluding that Addus submitted a Medicare claim for at least one of the several referred patients.

Addus also cites *United States ex rel. Fowler v. Caremark RX, L.L.C.*, 496 F.3d 730, 742 (7th Cir. 2007) *overruled on other grounds by Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907 (7th Cir. 2009), where the relators claimed that the defendant did not give a credit for a

---

contrast, the court dismissed the alleged AKS violation in the complaint because the relators "fail[ed] to identify a single patient that was referred[.]" *Id.* at 807. That is not the case here.

returned prescription that had been reimbursed, thus defrauding the government. The Court of Appeals upheld the dismissal because the relators "do not have any evidence to demonstrate that Caremark failed to reconcile this excess payment on a future invoice or through an otherwise proper accounting technique." *Id.* In contrast to this case, however, the relators in *Fowler* had materials from the United States' investigation into whether it would intervene, during which the defendant "disclosed in excess of 113,000 pages of documents." *Id.* at 734. Relator here has nothing close to this kind of access; not only does CW1 no longer work at Addus, but Relator alleges that she never had access to billing information.

Addus points out that the government would also have this information from the Medicare claims. (Reply in Supp. of Def. Addus's Mot. to Dismiss ("Addus Reply") [42] 6); *see United States ex rel. Grant v. Thorek Hosp. & Med. Ctr.*, No. 04 C 8034, 2007 WL 2484333, at *2 (N.D. Ill. Aug. 29, 2007) ("[A] relaxed pleading standard for a *qui tam* relator cannot be reconciled with the fact that a relator is a plaintiff who steps into the shoes of the government.").[17] Yet *Lusby*, decided two years after *Grant*, held that a relator need not plead the specifics of particular bills submitted to the government. If relators were imputed with all the knowledge that the government possessed, *Lusby* would not have reached this conclusion.[18]

Other cases cited by the parties confirm the court's conclusion that the FAC's allegations are sufficient. In *Dolan*, 2014 WL 3583980, at *2, 5, the relator presented examples of the

---

[17]    Like this case, the complaint in *Grant* also did not identify specific patients for whom false claims were submitted. *Grant*, 2007 WL 2484333, at *3.

[18]    Addus also cites *United States ex rel. Walner v. NorthShore University HealthSystem*, 660 F. Supp. 2d 891, 897 n.5 (N.D. Ill. 2009) for this proposition, but the court there did not decide that the complaint did not satisfy 9(b) solely on that basis. In *Walner,* Medicare sent the reimbursements directly to the relator, and the court pointed out that the relator "is in no position to claim that specific facts regarding his own patient care and Medicare payment are inaccessible to him." *Id.* at 897 & n.5. Similarly, in *United States ex rel. Marquis v. Northrop Grumman Corp.*, No. 09 C 7704, 2013 WL 951095 (N.D. Ill. Mar. 12, 2013), "[the relator] himself alleges that he was privy to detailed and intimate information" about the fraud. *Id.* at *3 (internal citation and quotation marks omitted). Relator in this case has pleaded specific information about the fraudulent practices—the only thing missing is details about the submitted claims, to which Relator lacks access.

alleged fraudulent conduct, but "fail[ed] not only to identify any specific claim presented in conjunction with these practices, but also to provide sufficient details—even in paragraphs describing 'exemplary' cases—to satisfy Rule 9(b)." The court explained that

> the relator cannot merely describe a private scheme in detail but then . . . allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government. Rather, he must link specific allegations of deceit to specific claims for payment.

*Id.* at *3 (omission in original) (internal citations and quotation marks omitted).[19]  *U.S. ex rel. Kennedy v. Aventis Pharm., Inc.*, 512 F. Supp. 2d 1158, 1167 (N.D. Ill. 2007), however, concluded that arguably similar allegations were sufficient: the relators there alleged that the defendants "promot[ed] and market[ed] off-label uses of [a drug], which they allege[d] caused healthcare providers to present false claims to the United States government . . . ." *Id.* at 1163. The court concluded:

> Relators have alleged with particularity facts regarding defendants' alleged off-label marketing. Specific facts, however, regarding particular claims were and

---

[19]      Other cases Addus has cited are readily distinguishable. *See U.S. ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 378 (7th Cir. 2003) (the relator "filed documents so long, so disorganized, so laden with cross-references and baffling acronyms[.]"); *U.S. ex rel. Swift v. DeliverCareRx, Inc.*, No. 14 C 7976, 2015 WL 10521636, at *4 (N.D. Ill. Oct. 26, 2015) ("Relator pled that Defendant purchased lists of potential customers and solicited those customers from an undisclosed 'offshore call center,' but all other detail is lacking.") (internal citations omitted); *U.S. ex rel. McGinnis v. OSF Healthcare Sys.*, No. 11-CV-1392, 2014 WL 2960344, at *8 (C.D. Ill. July 1, 2014) ("Relator does not allege any facts from which a court can fairly conclude the DME claims at issue were even submitted for payment and reimbursed. To the contrary, the First Amended Complaint still presents factual allegations that lead the Court to the conclusion that these DME claims were *not* submitted for reimbursement.") (emphasis added); *U.S. ex rel. Bragg v. SCR Med. Transp., Inc.*, No. 07-CV-2328, 2011 WL 1357490, at *4 (N.D. Ill. Apr. 8, 2011) ("The Court refuses to relax the requirements of Rule 9(b) here because specific information was available to Bragg to properly plead his fraud claims under the FCA."); *Obert-Hong*, 2001 WL 303692, at *3 ("This complaint is so conclusory it is questionable whether it would satisfy even liberal notice pleading standards."); *U.S. ex rel. Walsh v. Eastman Kodak Co.*, 98 F. Supp. 2d 141, 148 (D. Mass. 2000) ("As Chief Financial Officer of Carney, the Relator is certainly in a position to uncover a false cost report that resulted from false invoices, if one exists within Carney."). In its own attack on the complaint, Cigna (again, whose arguments Addus has incorporated) cites another similarly distinguishable case. *See Bantsolas ex rel. U.S. v. Superior Air & Ground Ambulance Transp., Inc.*, No. 01 C 6168, 2004 WL 609793, at *3 (N.D. Ill. Mar. 22, 2004) ("[The relator] described defendants' alleged scheme in only very general, vague terms" and identified patients who received services, but did not allege that the services were not medically necessary; if they were, then the claims were not illegal.).

are not likely within relators' reach. Given the significant proportion of medical care in this country that is financed by Medicare and Medicaid, relators have drawn a reasonable inference that claims for reimbursement regarding off-label uses of Lovenox were submitted to the federal government . . . for payment.

*Id.* at 1167. As in *Kennedy*, here Relator has described the scheme in detail and identified specific patients whose care followed the scheme, but omitted specific facts outside of its and CW1's reach. Relator has provided enough information, however, for the court to infer that claims were submitted to the government. As in *Lusby*, "much knowledge is inferential . . . and the inference" that Relator "proposes is a plausible one." *Lusby*, 570 F.3d at 854. Relator has alleged that Medicare reimbursements were pervasive enough that the court can infer that Addus submitted a Medicare claim for one of the patients that Relator has identified.

### ii.    Other Alleged Referral Schemes

Relator's allegations of other referral schemes fare less well. Unlike the Essington Place allegations, Relator does not allege examples of any specific patients who were part of the referral schemes at other facilities. Similarly, Relator provides no particulars about any patients referred by Dr. Dick, allegedly in exchange for Addus providing his daughter with a job.[20]

Finally, Relator alleges that Addus participated in a referral scheme with HPG to certify unqualified patients. Relator identifies patients allegedly unqualified for skilled services. (FAC ¶ 254.) The court could infer that, as in the Essington Place scheme, either Addus or HPG submitted claims to Medicare for these patients, because it makes no sense to describe patients as "unqualified" except in the context of qualifying *for Medicare* reimbursement. But Relator

---

[20]    Relator also mentions Addus's wellness center at Essington Place, and that CW1 "found it unusual" that Addus would pay rent to Essington Place for the wellness center. (FAC ¶ 157.) Relator condemns this practice as "additional compensation to Essington Place in exchange for Essington Place's referrals of residents to Addus" (FAC ¶ 160), but also notes that the rent was significantly below the market rent for similar space in Essington Place. (FAC ¶ 158.) The court is uncertain what Relator is alleging; either the rent should have been higher, or it should not have been paid at all, but cannot be both. Regardless, Relator gives no basis for concluding that the rent really was "additional compensation" for referrals instead of precisely what it purported to be: rent for Essington Place's space. Essington Place could legitimately benefit from Addus's operating a wellness center at the facility; that Addus may have charged more if it rented this unit as a residence does not necessarily make the rent discounts a kickback.

provides fewer details about these example patients. In the Essington Place examples, Relator offered e-mail excerpts discussing specific referrals, with some dates of starts of care, and referring to the overall scheme. No other details are necessary to explain that Essington Place referred these patients. The allegations about the HPG referral scheme, in contrast, are premised on the patients being unqualified for skilled services. Relator provides no details describing how these example patients were unqualified. But CW1 *was* in a position to have that information because she personally solicited such patients and should be able to identify at least some of them as examples. (FAC ¶¶ 251, 253.) The motion to dismiss is granted with respect to these schemes.

### 2. Falsely Certifying Patients as Eligible for Skilled Services

Relator alleges other violations of the False Claims Act as part of Counts I and II: that Defendants actually submitted claims (and supporting records) to the government for reimbursement falsely certifying that patients were eligible for skilled services; and that the claims complied with Medicare conditions for payment. These allegations suffer from the same problem as the alleged kickback scheme between Addus and HPG—Relator has not provided sufficient detail about the purported examples describing how these patients were allegedly unqualified.[21] And although Relator alleges that Defendants did not comply with Medicare conditions for payment, namely the face-to-face evaluation and certification/recertification requirement (FAC ¶ 297), Relator relies on the same insufficient examples of unqualified patients; there is no information about whether these patients had face-to-face evaluations or improper certifications. Accordingly, the motion to dismiss is granted with respect to these allegations.

---

[21]    Even if Relator had named HPG, not Cigna, as a defendant, Relator's allegations that HPG actually submitted claims suffers from the same deficiency. (*See* FAC ¶¶ 266–68.)

**B.    Count III: Conspiracy**

Count III alleges that HPG and Addus conspired to violate the False Claims Act.  Relator must plead a conspiracy claim premised on fraudulent conduct with particularity.  *Goldberg*, 929 F. Supp. 2d at 825 (citing *DiLeo*, 901 F.2d at 627).  Moreover, Relator must not only allege that Addus and HPG had an agreement, but it also must plead the underlying fraud with particularity. *See U.S. ex rel. McGee v. IBM Corp.*, 81 F. Supp. 3d 643, 666 (N.D. Ill. 2015) ("Accordingly, to adequately plead an FCA conspiracy claim, a plaintiff must allege 1) that "the [d]efendants had an agreement . . . to defraud the government by getting a false or fraudulent claim allowed or paid; and 2) that the [d]efendants did so for the purpose of obtaining or aiding to obtain payment from the government or approval of a claim against the government[.]") (omission and first and second alterations in original) (internal citation and quotation marks omitted).  As explained above, Relator does not plead that Addus or HPG submitted claims as part of the alleged fraudulent certification scheme with particularity.

Relator correctly notes that it need only allege an overt act to further the conspiracy, not necessarily that the government was actually defrauded, *see U.S. ex rel. Kroening v. Forest Pharm., Inc.*, 155 F. Supp. 3d 882, 894–95 (E.D. Wis. 2016) ("A civil conspiracy is a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage.") (internal citation and quotation marks omitted).  In the FAC, however, Relator has not alleged any overt acts with particularity.  Though Relator describes meetings at which Addus employees discussed HPG's certifications, a call center to process referrals, and reliance on

verbal orders to start patients on skilled services under Medicare (FAC ¶¶ 270–73), none of the allegations describe particular unqualified patients.[22]  Count III is dismissed.

### C.     Time Bar

Of the claims that remain, Addus moves to dismiss any alleged AKS violations that occurred before April 4, 2010.  A *qui tam* action under the FCA may not be brought more than six years after the date of the alleged false claim or more than three years after the relator becomes aware of the underlying facts, whichever comes later.  31 U.S.C. § 3731(b).  CW1 witnessed the alleged violations through April 2012, so the six-year option would be the longer time period.  Relator filed the FAC on April 4, 2016, and six years prior to that date would be April 4, 2010.  Relator alleges that these schemes may stretch back to 2008, but Addus argues that any alleged violations before April 2010 would fall outside the statute of limitations.  Relator responds that these pre-April 2010 allegations do not fall outside the statute of limitations because they relate back to the original complaint, filed in December 2013.

The FAC relates back to the original complaint if it "asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading."  FED. R. CIV. P. 15(c)(1)(B).  "In general, relation back is permitted . . . where an amended complaint asserts a new claim on the basis of the same core of facts, but involving a different substantive legal theory than that advanced in the original pleading."  *Bularz v. Prudential Ins. Co. of Am.*, 93 F.3d 372, 379 (7th Cir. 1996).  Relator argues that the pre-April 2010 allegations relate back to the original complaint because the complaints assert the same cause of action—violation of the FCA—and the only difference is that the FAC includes "an additional legal basis" for how the same conduct violates the FCA.  (Opp. to Addus 14–15.)

_____

[22]     While Relator does identify some unqualified patients, Relator identifies these patients as part of Addus's singular scheme to inflate diagnoses for skilled services, and does not allege that HPG was involved with these patients.  (FAC ¶ 254.)  Moreover, as described above, the FAC gives no detail as to why these patients were unqualified.

The court agrees. Although the original complaint does not mention the Anti-Kickback Statute, it describes numerous activities that constitute the alleged remuneration that Relator explicitly mentions in the FAC. For example, the original complaint describes Addus's efforts to market directly to potential senior living facility residents, encouraging perks for senior living facility managers, and soliciting hospitalized senior living facility residents. (Compl. ¶¶ 39–47, 53–58.) In fact, the original complaint refers to "a senior housing marketing scheme." (Compl. ¶ 38.) Even if the original complaint does not describe these activities as remuneration, the allegations in the FAC about the Essington Place referral scheme arise from the same core set of facts as those described in the original complaint.

In its opening brief, Addus argues that the allegations in the FAC do not arise out of the same conduct, transaction or occurrence as the original complaint. (Addus Mem. 15 n. 3.) In its reply memorandum, Addus argues that the fact that both complaints invoke the FCA is not enough, and that the original complaint did not mention Essington Place or other specific facilities and did not discuss any kickbacks. (Addus Reply 14–15.) As explained above, however, the allegations in the two complaints do not simply invoke the same statute; Relator describes the same conduct, albeit in more general terms, that it later labels as involving kickbacks. Second, even though the original allegations were more general, the core facts are the same. *See Feltman v. Blatt, Hasenmiller, Leibsker & Moore, LLC*, No. 06 C 2379, 2009 WL 3151878, at *3 (N.D. Ill. Sept. 25, 2009) (finding that although the amended complaint described debt collection practices separate from those alleged in the original complaint, "the new claims are based on the Defendants' debt collection practices, were mentioned in the original complaint, and arise out of the same conduct, transaction or occurrence as those alleged in the original complaint.") (internal citation and quotation marks omitted); *see also PNC Equip. Fin., LLC v. Zilberbrand*, No. 12-CV-03074, 2014 WL 448384, at *6–7 (N.D. Ill. Feb. 4, 2014) (finding that allegations of fraudulent transfer based on a specific agreement related back to the original

complaint, which did not mention the specific agreement but alleged similar fraudulent transactions).  These allegations are not time-barred.

## CONCLUSION

For the reasons stated above, Defendant Cigna's motion to dismiss [33] is granted, and Defendant Addus's motion to dismiss [36] is granted in part and denied in part.  Relator has leave to amend the complaint within 21 days.


ENTER:

Dated:  February 3, 2017

_____
REBECCA R. PALLMEYER
United States District Judge