UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* STOP ILLINOIS MARKETING FRAUD, LLC, <br><br>　　　　　Plaintiffs, <br><br>　　　v. <br><br> ADDUS HOMECARE CORPORATION, <br><br>　　　　　Defendant. | No. 13 C 9059 <br><br> Judge Rebecca R. Pallmeyer |

## MEMORANDUM OPINION AND ORDER

This is Relator Stop Illinois Marketing Fraud, LLC's third attempt at stating a claim for relief under the False Claims Act ("FCA"), 31 U.S.C. § 3729. Relator alleges that Defendant Addus Homecare Corporation committed Medicare fraud through multiple schemes aimed at providing kickbacks to senior living facilities in exchange for patient referrals. According to Relator, the Defendant falsely certified compliance with the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b, and submitted false reimbursement claims and records to Medicare for services provided to ineligible patients at dozens of senior living facilities across Illinois. (*See* Second Amended Complaint [49] ("SAC"), ¶ 2.)

The court dismissed Count III of the Relator's First Amended Complaint for failure to plead fraud with particularity as required by Federal Rule of Civil Procedure 9(b), and dismissed all but one of the fraudulent schemes Plaintiff alleged in support of Counts I and II. *See U.S. ex rel. Stop Illinois Marketing Fraud, LLC v. Addus Homecare Corp.*, No. 13-CV-9059, 2017 WL 467673, at *17 (N.D. Ill. Feb. 3, 2017) ("*Addus I*"). In the allegations that survived, Plaintiff described Defendant's alleged referral arrangement with one senior living facility, Essington Place. *Id.* at *11. The Relator's Second Amended Complaint purports to remedy the defects identified in the remaining counts. Relator also adds a new claim for relief under the Illinois False Claims Act, 750 ILCS 175/1 *et seq.*, based on the same allegations that support its

federal claims. Defendant again moves to dismiss in part. As explained below, the motion [58] is granted in part and denied in part.

## BACKGROUND

Defendant Addus Homecare Corp. is a Delaware company with its headquarters in Palatine, Illinois. (SAC ¶ 8.) Defendant provides two broad categories of home health care services—skilled and unskilled—to individuals unable to life fully independent lives. (*Id.* at ¶¶ 46, 51.) Unskilled services are non-medical in nature and include bathing, cooking, and transportation, among other things. (*Id.* at ¶ 46.) Defendant's provision of unskilled services is almost entirely paid for by state Medicaid programs. (*Id.* at ¶ 47.) Skilled services are those performed by medical professionals, and are eligible for reimbursement from the federal government's Medicare program. (*Id.* at ¶ 51.) In order to receive federal funds for medical care administered to Medicare recipients, service providers must "agree to abide by the rules, regulations, policies, and procedures governing reimbursement, and to keep and allow access to records and information as required by Medicare." (*Id.* at ¶ 56.) Providers bill Medicare for all eligible care provided to a patient within a given 60-day window. (*Id.* at ¶ 58.) For each claim submitted, Medicare requires providers to describe in detail the care provided, and to certify that the services were personally rendered by the provider, that the services were "reasonable and necessary," and that the patient treated was "confined to the home." (*Id.* at ¶¶ 56–81.) In addition to complying with Medicare's terms and conditions, care providers must also certify compliance with the Anti-Kickback Statute. The AKS prohibits providers from soliciting, receiving, offering, or paying any "remuneration" in exchange for referring a patient for services that are reimbursed by a federal health care plan. *See* 42 U.S.C. § 1320a-7b(b). Because compliance with the AKS is a prerequisite for Medicare reimbursement, offering or soliciting kickbacks to influence referrals for Medicare patients necessarily violates the False Claims Act as well. 42 U.S.C. § 1320a-7b(g).

Relator Stop Illinois Marketing Fraud, LLC is a Delaware company formed for the sole purpose of bringing this *qui tam* action. (*Id.* at ¶ 3.) Relator's allegations are based on the statements and knowledge of Confidential Witness 1 ("CW1")—a former Addus employee now employed by the Relator. (*Id.*) From November 2010 to April 2012, CW1 worked for Addus as an "Account Executive" and marketed its home health services in southern Illinois. (*Id.* at ¶ 89.) According to CW1, the home health care industry is highly competitive. Different senior living facilities are in constant competition to acquire and retain residents, and Addus and other care-providers compete against each other within those facilities to serve individual residents. (*Id.* at ¶¶ 97–102.) In light of these challenges, Relator claims that Addus's management team crafted a "referral recruitment plan" ("the Plan") in order to ensure a constant stream of Medicare-eligible patients. (*Id.* at ¶¶ 92, 101.) Under the alleged scheme, Addus would provide marketing services for specific senior living facilities to help them increase their occupancy—and therefore their profitability—in relation to competing facilities. (*Id.* at ¶¶ 102–08.) In exchange, the facility "would exclusively refer and recommend all of the facility's patients to Addus, and not to other home health companies." (*Id.* at ¶ 108.) CW1 claims that Addus's management sought to implement the referral recruitment plan across Addus's entire geographic footprint, but that CW1 personally witnessed the relevant conduct only in her assigned territory in southern Illinois. (*Id.* at ¶ 109.)

Relator filed its original complaint against Addus and another defendant, Cigna Corporation, for violations of the FCA on December 19, 2013. (Complaint [1].) On December 18, 2015, the United States notified the court that it would not intervene in the case. (Notice of the United States [12].) On April 4, 2016, Relator filed its First Amended Complaint, which claimed that Addus and Cigna violated False Claims Act Sections § 3729(a)(1)(A), (B), and (C) by submitting false claims to the government for payment (Count I), making false records and statements (Count II), and by conspiring to violate the FCA (Count III). (First Amended Complaint [32] ("FAC"), ¶¶ 298–320.) The majority of Relator's allegations concerned

the *quid pro quo* referral scheme at one location to which CW1 was assigned, Essington Place. (*See id.* at ¶¶ 91–174.) In support of its allegations, Relator offered CW1's first-hand accounts of Addus's practices, cited e-mails between CW1 and Addus management discussing the alleged scheme and its goals, and identified residents of Essington Place supposedly referred to Addus as a result of the scheme and their corresponding Medicare "starts of care." (*Id.*) In addition, Relator identified several other unlawful schemes in support of its FCA claims; namely, (1) that Addus implemented the same *quid pro quo* referral scheme at numerous other senior living facilities in Illinois (*Id.* at ¶¶ 176–83)[1]; (2) that Addus hired the daughter of a physician named Dr. Dick in order to secure further Medicare referrals from him (Id. at ¶¶ 184–91); (3) that Addus falsely certified patients as eligible for Medicare-reimbursable skilled services (*Id.* at ¶¶ 192–254); and (4) that Addus conspired with a company called HPG (a subsidiary of fellow-defendant Cigna Corp.) to obtain referrals and to falsely certify patients as eligible for Medicare-reimbursable services. (*Id.* at ¶¶ 255–87).

The Defendants moved to dismiss the First Amended Complaint on June 6, 2016, and this court granted the motion in part on February 3, 2017. Under Federal Rule of Civil Procedure 9(b), complaints alleging fraud must be pleaded with particularity—"the who, what, when, where, and how: the first paragraph of any newspaper story." *U.S. ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009) (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)). The court found that the First Amended Complaint met this standard only with respect to the alleged referral scheme described at Essington Place.

Based on the factual detail provided, the court was "satisfied that Relator's allegations both describe the scheme with particularity and support a strong inference that Addus submitted claims to Medicare for patients referred by Essington Place." *Addus I*, 2017 WL 467673, at *11.

---

[1] Relator alleged that these facilities included, but were not limited to, two named locations—"Church Creek" and "Tamarack"—owned by Holiday Retirement, the owner of Essington Place; twenty-two unnamed facilities owned by Senior Lifestyle Corporation ("SLC"); and an unknown number of unnamed facilities owned by Sunrise Senior Living. (FAC ¶ 176.)

The First Amended Complaint described the referral scheme and named specific patients at Essington Place that had been referred to Addus. *Id.* Defendant argued that the complaint was insufficient under Rule 9(b) because Relator did not identify specific *claims* submitted to Medicare, but the court rejected that argument:

> "[W]hen details of the fraud itself 'are within the defendant's exclusive knowledge,' specificity requirements are less stringent." *Goldberg v. Rush Univ. Med. Ctr.*, 929 F. Supp. 2d 807, 815 (N.D. Ill. 2013) (quoting *Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1328 (7th Cir. 1994)). Here, Relator explained that CW1 was responsible only for soliciting patients who were on Medicare, and had no responsibility for billing. Addus effectively suggests that CW1 should have retained more records, but this places an unreasonable burden on relators, especially in a situation like this one, where CW1 was involved in soliciting more than a hundred patients while at Addus.
>
> . . . Relator alleges that a significant amount of Addus's revenue came from skilled services reimbursements from Medicare: the FAC alleges that "Addus went from zero to dozens of Medicare referrals" in the first three months of the Essington Place scheme and significantly increased its Medicare revenue for the duration of the alleged scheme. Second, Relator infers that Addus submitted many claims to Medicare because Addus paid CW1 bonuses for each Medicare patient to whom Addus provided skilled services. Third, Relator identifies 54 specific Medicare starts of care in a mere four-month period from August to November 2011; though the FAC does not specify that these were all at Essington Place, it allows the inference that many of Addus's patients were covered by Medicare. Finally, Relator alleged that Addus's billing system can identify specific patients whose claims were submitted to Medicare. Addus alone has access to its billing system from which these patients are most easily identified; CW1 does not, and apparently never had, access to this system.

*Id.* (internal citations to record omitted). This court concluded that Relator had provided enough detail to describe the fraudulent scheme and identify specific patients who received care pursuant to that scheme in order to survive the Defendant's motion to dismiss. *Id.* at *14. Although facts concerning specific claims remained outside of Relator's reach, the court was satisfied that Relator's allegations were sufficient to support an inference that Addus submitted claims to the government based on the alleged scheme at Essington Place. *Id.*

The court did not, however, extend this conclusion to Relator's other four theories of recovery. The court found Relator's allegations lacking with respect to the alleged conspiracy with HPG, and dismissed Count III of the First Amended Complaint. *Id.* at *16. Relator's

5

allegations were also not sufficient to hold Defendant Cigna liable as HPG's successor-in-interest for conduct that had occurred before Cigna acquired HPG in 2013, and the court dismissed Cigna as a party to the case as well. *Id.* at *6–8. The court also rejected the Relator's other theories in support of Counts I (submitting false claims) and II (making false records). In support of its theory that Addus falsely certified ineligible patients for skilled services, Relator identified specific patients but failed to describe how they were not qualified for the care they received—information that CW1 was in the position to know. *Id.* at *15. Accordingly, the court dismissed Relator's false certification theory. Relator provided even less detail in regards to the alleged referral schemes with Dr. Dick and at the numerous other senior living facilities. *Id.* Relator did not identify any patients or allege any particulars for these other schemes. Apart from the Church Creek and Tamarack facilities, Relator failed to even provide the names of the more than twenty-three other locations at which Addus allegedly implemented referral schemes. *Id.* The court found that the limited information alleged as to these other locations was not sufficient to raise an inference that Addus submitted false claims to Medicare for illegally-referred patients anywhere but at Essington Place.

On March 3, 2017, Relator filed the present Second Amended Complaint. The Second Amended Complaint is largely identical to the previous complaint, but there are three significant main differences. For one, Relator has dropped its claims against Cigna Corp. (SAC 1.) Only Addus Homecare remains as a defendant in this case. Next, Relator provides more detail with respect to certain other senior living facilities at which it believes Addus implemented the *quid pro pro* referral scheme underlying Relator's claims for relief under the federal False Claims Act (Counts I and II). (*Id.* at ¶¶ 218–48.) Finally, Relator asserts a new claim for relief under the Illinois False Claims Act ("IFCA")—which Relator claims that Addus violated based on largely the same conduct that gives rise to its federal FCA claims.[2] (*Id.* at ¶¶ 383–93.)

---

[2] Relator's IFCA claim is "Count III" in the Second Amended Complaint. Count III in the First Amended Complaint was for Defendant's alleged conspiracy with HPG to violate the

6

Defendant has again moved to dismiss. (See Defendant's Partial Motion to Dismiss Plaintiff's SAC [58] ("Def.'s Partial MTD"), 1.) Defendant urges the court to dismiss all of Relator's allegations underlying its claims for relief under FCA Sections 3729(a)(1)(A) and (B) in Counts I and II—except those concerning the Essington Place referral scheme which this court previously found to be pleaded with particularity. (*See* Memorandum in Support of Def.'s Partial MTD [59] ("Def.'s Opening Br."), 1.) Defendant also asks the court to dismiss in its entirety Count III of the Second Amended Complaint: Relator's IFCA claim. (*Id.*) Defendant argues that that (1) Relator's additional allegations regarding the referral schemes at other senior living facilities are still insufficient to meet the pleading requirements of F.R.C.P. 9(b); (2) Relator failed to elaborate upon the other alleged fraudulent schemes previously dismissed by the court; and (3) Relator is barred from proceeding with its claim under the IFCA because it failed to comply with the IFCA's statutory filing under seal requirement. (*Id.* at 1–3.)

## DISCUSSION

**1.     Alleged Referral Schemes at other Locations**

Complaints alleging violations of the False Claims Act must be pleaded with particularity—"which means the who, what, when, where, and how: the first paragraph of any newspaper story." FED. R. CIV. P. 9(b); *Lusby*, 570 F.3d at 853 (internal citation omitted). Moreover, it is not sufficient for a relator to merely describe fraudulent or unlawful activity. A relator must allege that the defendant submitted false *claims*. *See U.S. ex rel. Grenadyor v. Ukrainian Village Pharmacy, Inc.*, 772 F.3d 1102, 1107 (7th Cir. 2014); *U.S. ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 378 (7th Cir. 2003) (affirming the dismissal of a complaint that "fail[ed] to link [specific allegations of deceit] to any claim for payment"). The Seventh Circuit has long recognized that relators may not be in the position to know the details of specific claims sent to the government. *See, e.g., Lusby*, 570 F.3d at 853–54. As such, relators

---

FCA, 31 U.S.C. § 3729(a)(1)(C). This alleged conspiracy no longer serves as the basis for its own claim for relief, but Relator continues to allege the facts underlying the conspiracy in support of Counts I and II. (*See* SAC ¶¶ 322–54, 369, 372.)

are entitled to rely on reasonable inferences that false claims were, in fact, submitted and "do[ ] not need to present, or even include allegations about, a specific document or bill." *U.S. ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 777–78 (7th Cir. 2016); *Lusby*, 570 F.3d at 853–54. In the case of FCA suits based on violations of the Anti-Kickback Statute, it is nevertheless essential to identify a link between the alleged kickback and a claim for repayment. *See Grenadyor*, 772 F.3d at 1107; *United States v. Nuwave Monitoring, LLC*, No. 12 C 69, 2016 WL 750155, at *5 (N.D. Ill. Jan. 26, 2016). As this court recognized in its previous opinion, such an allegation necessarily requires a relator to name "a specific patient referred in exchange for a kickback, and allege that a claim was submitted to Medicare for that patient." *Addus I*, 2017 WL 467673, at *10 (citing Grenadyor, 772 F.3d at 1107).

Relator's Second Amended Complaint again focuses on the alleged referral scheme that Addus implemented at Essington Place. (*See* SAC ¶¶ 92–171.) With respect to the Essington Place scheme, Relator supports its allegations with e-mails between CW1 and Addus management, CW1's personal recollection of company meetings, description of Addus' business processes, and, most critically, references to specific patients allegedly referred to Addus as a result of the scheme. (*See id*. at ¶¶ 165–69.) Although CW1 does not have personal knowledge of any claims that Addus submitted to Medicare for payment on behalf of illegally-referred patients, the inference that such claims were submitted is a fair one: Relator alleges that the referred patients were covered by Medicare and that Addus provided treatment. *See Addus I*, 2017 WL 467673, at *11–14.

Relevant to the present opinion, Relator alleges that this scheme was widely replicated across other senior living facilities. Relator claims that these other facilities include, but are not limited to:

- Two other facilities owned by Holiday (the owner of Essington Place): Church Creek and Tamarack;
- Fifteen named facilities owned by SLC, in particular one called "Autumn Green at Midway Village" ("Autumn Green"); and
- An unknown number of unnamed facilities owned by Sunrise.

8

(SAC ¶¶ 218, 231, 239.) Relator's allegations concerning most of these locations, however, are sparse and largely limited to CW1's recollections of conversations she had with other Addus employees "where it was confirmed that Addus had relationships with other senior facilities that were identical to that between Addus and Essington Place." (*Id.* at ¶ 172.) These barebones allegations—most only one-off mentions of a location's name (if a name is provided at all)—are identical to the Relator's previous, insufficient complaint.

Relator mentions the Church Creek location just twice in the Second Amended Complaint. (SAC ¶¶ 133, 218.) Relator claims that Church Creek was another facility at which Addus "implemented this identical quid pro quo scheme," but fails to make a single factual allegation as to Church Creek. (*Id.* at ¶ 217.) Relator does not identify any patients referred to Addus as a result of the scheme, nor allege that Addus submitted any claims to Medicare on their behalf. With respect to Church Creek, the Second Amended Complaint is identical to Relator's previous complaint. (*See* Redline of SAC ¶¶ 133, 218, Ex. A to Def.'s Opening Br. [59-1].) As for the fourteen SLC locations (aside from Autumn Green), the Relator now provides names for the locations, but again fails to identify any patients referred to Addus. (*Id.* at ¶ 239.) The same is true for the Sunrise locations, which Relator cannot name or even quantify.

Only Tamarack and Autumn Green bear discussing at greater length. Relator has alleged much more factual detail for these two locations, including lists of specific patients referred to Addus (forty-one in total) and their corresponding "starts of care." (*See* SAC ¶¶ 227, 237.) Relator claims to have this information based on an "Addus Tracking Log" in the possession of CW1. (*Id.* at ¶ 236.) This tracking log contains patient referral information for September 2010–January 2011, and contains "[the] date the patient was referred, [the] date Addus started providing care, the payor source, and the referral source." (*Id.*) The tracking log also identified all forty-one referred patients as Medicare beneficiaries. Relator alleges that Addus implemented the exact same scheme at Tamarack and Autumn Green that it did at Essington Place. (*Id.* at ¶¶ 223–26, 231–35.) In support, Realtor relies on conversations that

9

CW1 claims to have had with other Addus employees responsible for those locations, the marketing meetings CW1 was present for, and, in the case of Autumn Green, the co-marketing proposal prepared by Addus which outlines the contours of the referral scheme. These new details satisfy the court that Relator has alleged facts sufficient to infer that Addus submitted false claims and created false records in violation of the AKS with respect to these two additional locations.

Relator insists its allegations are sufficient with respect to every one of the locations mentioned in the Second Amended Complaint.[3] In particular, Relator points to allegations concerning the facilities' overlapping ownership, CW1's managers' alleged control over the scheme at all locations, and the fact that the marketing proposals cited in the complaint were "provided to [CW1] and other account executives as an example so that they could implement the same arrangement at their facilities." (Plaintiff-Relator's Opposition to Def.'s Partial MTD [66] ("Rel.'s Resp. Br."), 5.) Relator emphasizes that "this implementation was far from hypothetical; at the same time CW1 was provided with the proposal, [fellow account executive Erich] Connor explained how the scheme was implemented at every SLC facility." (*Id.*) (citing SAC ¶¶ 232, 239, 242–45.) Unfortunately, this argument does not address the infirmity that concerns the court.

For purposes of this analysis, the court assumes (over Defendant's objection, Def.'s Opening Br. 7), that Addus "entered into the exact same agreement" with other facilities. Relator described the illegal referral scheme using Essington Place as a template, and plausibly alleged based on CW1's own knowledge that Addus, at the very least, attempted to repeat this scheme elsewhere. Even assuming that the scheme did exist everywhere Addus operated,

---

[3] For its part, Defendant argues that Relator has still failed to plead with particularity that false claims were submitted at Tamarack and Autumn Green, and that Relator's allegations as to those locations should be dismissed as well. (Def.'s Opening Br. 6–9.) As explained, however, Relator's allegations regarding Tamarack and Autumn Green closely match those the court already deemed sufficiently particularized at Essington Place. *See Addus I*, 2017 WL 467673, at *11.

10

however, the Second Amended Complaint's true deficiency is that the Relator failed to allege any false *claims* submitted as a result of the schemes at the vast majority of locations mentioned in the complaint. Relator is correct that "an inference is enough" to survive Rule 9(b), *see, e.g., Presser*, 836 F.3d at 778, but that principle does not support Relator's the notion that evidence creating an inference of fraudulent behavior is also sufficient to support an inference that the behavior included specific false claims. In *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849 (7th Cir. 2009), the relator alleged that Rolls-Royce defrauded the government by charging it for deficient aircraft parts. *Id.* at 853. The relator knew that Rolls-Royce falsely certified that the parts met the government's specifications, and that Rolls-Royce shipped them to the government and received payment in return. *Id.* at 853–54. The court held that this information was sufficient to infer that false claims were submitted, despite the relator's lack of invoices (the actual "false claims") for those parts. *Id.* at 854. Similarly, in *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770 (7th Cir. 2016), the Seventh Circuit held that the relator's complaint alleged false claims with particularity when the complaint "made clear that the questionable practices and procedures were applied to all patients at the clinic." *Id.* at 778. Plaintiffs do not need to present or allege specific documents that a defendant submitted to the government, but in both of the cases described above the Seventh Circuit found that "the alleged facts *necessarily* led one to the conclusion that the defendant had presented claims to the Government." *Id.* (emphasis added). That is not the case here.

Based on the complaint, it is not clear whether the majority of the senior living facilities mentioned referred *any* patients to Addus, much less referred them to Addus after being offered an illegal kickback in the form of co-marketing services. It is similarly unknown whether those hypothetical patients were covered by Medicare and whether Addus received payment from the government for their treatment. In short, Relator asks the court to infer *both* that the fraud occurred at all of these other locations *and* that Addus submitted false claims as a result. Relator notes that merely offering the co-marketing services in exchange for referrals "is in itself

11

a violation of the AKS" (SAC ¶ 248; *see also* Rel.'s Resp. Br. 9), but fails to recognize that such an exchange is not a *per se* violation of the FCA. Kickbacks are not actionable under the FCA unless someone submits claims to the government for payment based on those kickbacks. To paraphrase the Seventh Circuit's instructions in *United States ex rel. Grenadyor v. Ukrainian Village Pharmacy, Inc.*, 772 F.3d 1102 (7th Cir. 2014),

> it is not enough to allege, or even prove, that the [Defendant] engaged in a practice that violated a federal regulation. Violating a regulation is not synonymous with filing a false claim. To comply with Rule 9(b) [Relator] would have had to allege either that the [Defendant] submitted a claim to Medicare [ ] on behalf of a specific patient who had [been referred based on] a kickback, or at least name a Medicare patient who had [been referred based on] a kickback.

*Id.* at 1107. With the exceptions of Essington Place, Tamarack, and Autumn Green, the Relator here has not provided sufficient detail for the court to find any link between the allegedly fraudulent activity and a claim for payment from the government. The Defendants' partial motion to dismiss is denied with respect to any false claims submitted for patients residing at Tamarack and Autumn Green, but granted with respect to all other locations mentioned in the Second Amended Complaint.

### 2.      Relator's other Theories of Recovery under the FCA

Relator's Second Amended Complaint repeats verbatim its allegations of (1) the referral scheme with Dr. Dick, (2) the false Medicare certifications, and (3) the conspiracy with HPG. (*See* SAC ¶¶ 251–354.) Relator acknowledges that it failed to elaborate upon these claims, and states it only included them for the purpose of preserving these claims on appeal. (Rel.'s Resp. Br. 1 n.1.) Realtor's argument is preserved. The court again dismisses these three claims for the same reasons outlined in its previous opinion. *See Addus I*, 2017 WL 467673, at *15–16.

### 3. Relator's New Illinois False Claims Act Claim

Relator's claim for relief under the Illinois False Claims Act requires only brief comment. Like the federal FCA, the IFCA prohibits, among other things, knowingly presenting false or fraudulent claims for payment, and knowingly making or using false records material to such claims. 740 ILCS 175/3(a)(1)(A), (B). Private parties bringing *qui tam* actions under the IFCA must first serve the State of Illinois with the complaint and disclose all material evidence and information the party possesses. 740 ILCS 175/4(b)(2). "The complaint shall be filed in camera, shall remain under seal for at least sixty days, and shall not be served on the defendant until the court so orders." *Id.* Private parties may not proceed with their IFCA claims unless the State declines to intervene in the action. 740 ILCS 175/4(c). The parties do not dispute that Relator did not file the Second Amended Complaint *in camera* and under seal with the State of Illinois. Defendant argues that this failure necessitates dismissal of Relator's state law claims. (Def.'s Opening Br. 12) (citing *Carter v. Hamilton*, No. 4-10-0256, 2011 WL 10481828, at *3–4 (Ill. App. Ct. Apr. 26, 2011)). While the court notes that the IFCA's filing-under-seal requirement is procedural, not jurisdictional, and thus does not mandate dismissal, *see State Farm Fire and Cas. Co. v. U.S. ex rel. Rigsby*, 137 S. Ct. 436, 443 (2016), the court agrees that Count III should be dismissed. Relator filed suit in 2013, and this is the Relator's third complaint. Furthermore, Relator has been aware of the possibility that Defendant's conduct also violated the IFCA, and mentioned that possibility months ago (*see* FAC ¶ 25), yet Relator still neglected to assert that claim until now.

Relator advances several arguments in an attempt to keep its IFCA claim alive, but none succeed. For one, Relator asserts that the IFCA's sealed filing requirement applies only to original complaints, not amended ones. (Rel.'s Resp. Br. 14) (citing *Wisz ex rel. U.S. v. C/HCA Dev., Inc.*, 31 F. Supp. 2d 1068, 1069 (N.D. Ill. 1998) (discussing the identical filing-under-seal provision in the federal FCA). Relator ignores, however, that the plaintiffs are only relieved from the burden of filing their amended complaints under seal if they filed their *original* complaints

13

under seal.  *See Wisz*, 31 F. Supp. 2d at 1069 ("Wisz' second amended complaint alleged the same type of fraudulent conduct as the original complaint, which the Government already had a chance to review."); *U.S. ex rel. King v. F.E. Moran, Inc.*, No. 00-C-3877, 2002 WL 2003219, at *12–13 (N.D. Ill. Aug. 29, 2002) (declining to dismiss a *qui tam* action when the relator filed an original complaint under seal, but failed to notify the government of additional allegations within the same claim for relief).  Here, Relator filed its original complaint under seal with the federal government as required, but the original complaint did not seek relief under Illinois law.  Accordingly, the State of Illinois never had an opportunity to intervene in the action.  The notice and opportunity that Relator afforded the federal government does not absolve Relator of its duties to the State of Illinois.

Realizing this oversight too late, Relator notified the State of Illinois of its intent to sue under the IFCA *after* Defendant filed its Partial Motion to Dismiss.  On May 24, 2017—almost two months after Defendant moved to dismiss—the court received notice from the Illinois Attorney General that the State declined to intervene.  (State of Illinois' Notice of Declination of Intervention [68] ("Illinois Declination Notice").)  The State's notice quotes the IFCA and states that the Relator is permitted to maintain the action, requests that the State remain appraised of any developments, and reminds the parties that the "action may be dismissed only if the court and Attorney General give written consent to the dismissal[.]"  (Illinois Declination Notice 1) (quoting 740 ILCS 175/4(b)(1)).  Relator argues that this last provision regarding dismissal bars the court from dismissing the IFCA claims without the State's approval.  (Plaintiff-Relator's Sur-Reply to Def.'s Partial MTD [73] (Rel.'s Sur-Reply Br."), 1–2.)  Not so.  Section 175/4(b)(1) only applies to voluntary dismissals or settlements initiated by the parties, not to court-ordered *involuntary* dismissals.  *See Scachitti v. UBS Fin. Servs.*, 215 Ill. 2d 484, 512, 831 N.E.2d 544, 560 (2005) ("[T]he Attorney General must give written consent to any attempt by the *qui tam* plaintiff to dismiss the action."); *Salmeron v. Enterprise Recovery Systems, Inc.*, 579 F.3d 787, 797 n.5 (7th Cir. 2009) (rejecting an identical argument in a federal FCA action).

14

Relator further argues that the State's interests would be harmed should the court dismiss the case, and that, based on the contents of its Declination Notice, the State of Illinois "does not believe" the case should be dismissed. (Rel.'s Sur-Reply Br. 2.) Relator asserts that "[i]f Illinois wanted the claims dismissed for the reasons advanced by Addus, then it would not have mentioned, let alone reserved, its right to intervene in the future." (*Id.*) Relator's argument is a stretch, at best. The State declined to intervene. Although a government's declination is not a dispositive statement on the merits of a *qui tam* action, it can hardly be construed as an affirmative endorsement, as Relator suggests is the case here. The State's notice is a form letter—lacking any reference to the details of Relator's action and merely reciting the procedural requirements of the IFCA. (*See* Illinois Declination Notice 1–2.)

## **CONCLUSION**

For the reasons stated, the Defendant's Partial Motion to Dismiss [58] is granted in part and denied in part. The case will proceed on Counts I and II of the Second Amended Complaint, and only with respect to Relator's allegations regarding the Defendant's alleged referral scheme at the Essington Place, Tamarack, and Autumn Green senior living facilities. Defendant is directed to respond to those allegations within 21 days. Relator's remaining allegations and claims for relief are dismissed with prejudice.

ENTER:

Dated: March 21, 2018

REBECCA R. PALLMEYER
United States District Judge